The WAHKIAKUM BAND OF CHINOOK INDIANS, et al., Plaintiffs-Appellants,

v.

Mrs. Allen BATEMAN, Defendant-Appellee.

No. 80–3211.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted May 6, 1981.

Decided Aug. 31, 1981.

Stuart F. Pierson, Verner, Liipfpert, Bernhard & McPherson, Washington, D. C., for plaintiffs-appellants.

Paul S. Majkut, Asst. Atty. Gen., Olympia, Wash., Beverly B. Hall, Asst. Atty. Gen., Portland, Or., Robert Nash, Johnson, Marceau, Karnopp & Petersen, Bend, Or., argued for defendant-appellee; William F. Gary, Sol. Gen., James W. Moorman, Washington, D. C., on brief.

* Hon. Thelton E. Henderson, United States District Judge for the Northern District of California, sitting by designation.

1. According to the record on appeal, the defendant-intervenor Confederated Tribes of the Warm Springs Reservation moved for summary judgment on December 7, 1979. On December 14, 1979 all other defendants joined the Warm Springs motion except the Commercial Fishermen who had not received a copy of the motion and were therefore uncertain about joinder. There is no evidence in the record that the Commercial Fishermen ever joined in the motion or were dismissed from the case. At the hearing on the motion for summary judgment on April 18, 1980, however, the judge began the proceedings:

> When this motion was originally filed, all the Defendants joined in the motion for summary judgment with the exception of the State of Washington. But since that time, as I understand it, and by virtue of correspondence the Court recently received, I take it that the State of Washington has also now joined in the motion for summary judgment; is that correct?

The attorney for the Washington defendants answered affirmatively. The Commercial Fishermen's attorney was not present at the hearing.

Before KENNEDY and ALARCON, Circuit Judges, and HENDERSON,* District Judge.

ALARCON, Circuit Judge:

Appellants, the Wahkiakum Band of Chinook Indians, et al., (Wahkiakum) appeal from the district court's grant of summary judgment.[1] We affirm.

■ The Wahkiakum sought declaratory and injunctive relief to protect their alleged fishing rights in the Columbia River, naming as defendants officials of the states of Oregon and Washington responsible for regulating the harvesting of fish in the Columbia River. Three other entities, the Confederated Tribes of the Warm Springs Reservation, the Confederated Tribes of the Umatilla Indian Reservation, and the Columbia River Fishermen's Protective Union, and two of its officers (Commercial Fishermen), were allowed to intervene as defendants. The Quinault Indian Nation and the

Because the judge believed all defendants had joined in the motion for summary judgment, he wrote the order granting the summary judgment as if it disposed of all parties. The order states in pertinent part:

> Each of the defendants and defendant-intervenor have joined in the Motion. The matter has been extensively briefed by all parties in favor of, and in opposition to the Motion for Summary Judgment.

Technically, however, Commercial Fishermen did not seek summary judgment and is still a party. Consequently, without a certification under either Fed.R.Civ.P. 54(b) or 28 U.S.C. § 1292(b) (1976), we normally would not have jurisdiction over this appeal. See Meyer v. Bell & Howell Co., 584 F.2d 291 (8th Cir. 1978).

However, where, as here, the parties have not briefed the issue, the trial court believed it was disposing of the entire case, and no useful purpose would be served by dismissal, we may exercise our discretion and hear the appeal. Gillespie v. United States Steel Co., 379 U.S. 148, 152–54, 85 S.Ct. 308, 310–12, 13 L.Ed.2d 199 (1964); Lockwood v. Wolf Corp., 629 F.2d 603, 608 (9th Cir. 1980); Riggle v. California, 577 F. 2d 579, 581 n.A (9th Cir. 1978); Westcott v. Impresas Armadoras, S.A., Panama, 564 F.2d 875, 880–81 (9th Cir. 1977).

United States[2] have participated as *amici curiae* urging affirmance.

In the district court, appellants asserted a federally protected right to fish the waters of the Columbia River at their usual and accustomed grounds based on (1) the laws, treaties and Constitution of the United States; and in the alternative (2) an aboriginal fishing right. The defendants moved for summary judgment denying the existence of such rights as a matter of law.[3] The district court granted the defendants' motion for summary judgment, finding that the Wahkiakum holds neither a treaty nor an aboriginal right to fish the waters of the Columbia River at the Wahkiakum's usual and accustomed grounds and stations.

On appeal, appellants contend that they are beneficiaries of the treaty between the United States and the Quinaults and Quillehutes which was signed on July 1, 1855, and January 25, 1856 (Treaty of Olympia)[4] and that this treaty secures to them the right to exercise Indian fishing rights in the Columbia River. In the alternative, appellants contend that they hold unextinguished aboriginal rights to fish the usual and accustomed grounds of the Wahkiakum. We find no merit in either contention.

## RIGHTS UNDER THE TREATY OF OLYMPIA

■ Appellants tell us that because they affiliated with the signatories of the Treaty of Olympia, they have the right to fish the traditional Wahkiakum grounds in the Columbia River. They contend that the United States Supreme Court, in *Halbert v. United States*, 283 U.S. 753, 51 S.Ct. 615, 75 L.Ed. 1389 (1931), found that the Chinooks[5]

had been affiliated with the Quinault under the Treaty of Olympia and that post-treaty affiliation placed the after-affiliated tribes in the same position as they would have been if they had been original signatories to the treaty. They say that, since the treaty states that the Quinault can fish in its usual and accustomed places, the post-affiliated tribes can fish in their own usual and accustomed places. *Halbert* does state that the Chinook are affiliated with the Quinault under the Treaty of Olympia, but the rights granted thereby to appellants are not so extensive as they suggest. The treaty protects only the fishing grounds of signatories, not of the after-affiliated tribes. An examination of *Halbert* illuminates the error in appellants' argument.

The *Halbert* appellants, individuals of varying degrees of Indian blood, asserted rights to an allotment of land on the Quinault Reservation. Among the questions presented in *Halbert* were: (1) whether the Chehalis, Chinook and Cowlitz tribes were among those entitled to allotments on the Quinault Reservation; and (2) whether residence on the reservation was requisite to the right of allotment. In holding that members of the Chinook are among those who are entitled to the allotment right and that personal residence on the reservation is not necessary, the Court reviewed the history of the Treaty of Olympia, the Executive Order of November 4, 1973, and the 1911 Allotment Act. 283 U.S. at 756–60, 51 S.Ct. at 615–17.

Pursuant to the treaty, a reservation was selected and surveyed, but it proved to be inadequate for the use of the Quinault and Quillehute. The local superintendent re-

---

2. Our disposition of this case makes it unnecessary for us to reach the issue of jurisdiction to determine tribal status raised by the United States in its amicus brief.

3. Because the parties concede the existence of the Wahkiakum as a tribe and its status as a non-signatory to any ratified treaty, no disputed issues of material fact remained to bar a summary judgment.

4. Treaty between the United States and the Qui-nai-elt and Qui-leh-ute Indians, July 1, 1855 and January 26, 1856, 12 Stat. 971. Signatories

to the Treaty of Olympia were leaders of the Quinault and Quillehute tribes. Although the Chinook and others were involved in the negotiations, they did not sign the treaty.

5. The Supreme Court's opinion applied generally to all of the Chinook Indians. We have before us one small group of the Chinook known as the Wahkiakum Band of Chinook Indians. Thus, what the Supreme Court held with respect to all Chinook applies to these Wahkiakum appellants.

ported the inadequacy and recommended that all of the fish-eating tribes of the locality be collected on a single reservation, including suitable fisheries. Upon this recommendation, the President of the United States, acting under the authority of Article VI of the treaty,[6] issued the Executive Order of November 4, 1873, expanding the Quinault reservation "for the use of the Quinault, Quillehute, Hoh, Quit, *and other tribes of fish-eating Indians on the Pacific coast.*" (emphasis added). By this order the Chinook and other tribes became affiliated with the Quinault under the treaty.[7] The Act of March 4, 1911, directing the Secretary of the Interior to make land allotments to members of these affiliated tribes, was meant to clarify and affirm their rights to land allotments. The *Halbert* Court found that the Act of March 4, 1911 did not require personal residence on the reservation because of the unique circumstances concerning the Indians before the court.[8]

In discussing their special situation, the Court noted that the Indians seeking allotments were fishermen and referred to Article III of the treaty which secures "the right of taking fish at all usual and accustomed grounds." Appellants contend that this reference to Article III of the treaty of

Olympia in *Halbert* was a recognition by the Supreme Court that the affiliated tribes have a right to fish at their own usual and accustomed grounds even though they do not reside on the Quinault Reservation.[9] Thus, appellants tell us, their fishing rights in the usual and accustomed grounds of the Wahkiakum are protected. This ignores the scope and nature of the issues addressed by the Court in *Halbert.* The Court made clear that although the Indians could not support themselves by living on the reservation, they could do so by fishing there.

Appellants also ignore the structure of the treaty and the context in which the affiliation occurred. Only the Quinault and the Quillehute signed the treaty, and therefore only their fishing grounds are protected by Article III. Article VI merely provided the mechanism for consolidation of other tribes on a single reservation with the Quinault. Subsequent affiliation does not, under Article VI, give the Wahkiakum standing as a treaty signatory, nor does it resurrect and protect any fishing rights the Wahkiakum may have had originally. As members of a tribe subsequently affiliated with the Quinault under the treaty, they are, however, entitled to share such rights as are granted to the original signatories by

6. ARTICLE VI. The President may hereafter, when in his opinion the interests of the Territory shall require, and the welfare of the said Indians be promoted by it, remove them from said reservation or reservations to such other suitable place or places within said Territory as he may deem fit, on remunerating them for their improvements and the expenses of their removal, or may consolidate them with other friendly tribes or bands, in which latter case the annuities, payable to the consolidated tribes respectively, shall also be consolidated; and he may further, at his discretion, cause the whole or any portion of the lands to be reserved, or of such other land as may be selected in lieu thereof, to be surveyed into lots, and assign the same to such individuals or families as are willing to avail themselves of the privilege, and will locate on the same as a permanent home, on the same terms and subject to the same regulations as are provided in the sixth article of the treaty with the Omahas, so far as the same may be applicable. Any substantial improvements heretofore made by any Indians, and which they shall be compelled to abandon in consequence of this treaty, shall be valued under the direction of the President, and pay-

ment made accordingly therefor. 12 Stat. 971, 972.

7. The actions of the Indian Bureau, which began granting land allotments in 1905 to members of fish-eating tribes other than the Quinault and Quillehute, completed the affiliation process.

8. The Court found that the Quinault and other fish-eating tribes were never placed on a reservation or required to live there as other tribes had been, and the majority of these Indians had never lived on any reservation. Furthermore, the Quinault reservation land, being covered with a heavy growth of timber and thus difficult to clear, was unsuitable for providing the Indians with a means of supporting themselves.

9. Appellants cite cases which considered fishing rights in the context of tribes which were signatories or political successors to signatories to ratified treaties. Because the Wahkiakum is not a signatory to any ratified treaty, discussion of these cases would be irrelevant.

the treaty.[10] The members of the Wahkiakum, a tribe of fish-eating Indians of the locality, have the opportunity to take an allotment on the Quinault Reservation and to exercise the fishing rights which accompany that allotment. Those fishing rights are secured by Article III which protects the rights of the Quinault and any affiliated tribe to fish at all usual and accustomed Quinault fishing grounds. The Columbia River areas claimed by the Wahkiakum were not traditional grounds of the Quinault and thus are not covered by Article III.[11] Therefore, the Wahkiakum do not hold a treaty-protected right to fish the Columbia River.

## ABORIGINAL FISHING RIGHTS

Appellants, as an alternative basis for claiming fishing rights, alleged that members of the Wahkiakum have fished the Columbia River since the tribe's aboriginal existence and based on this long continuous use of the area they hold an aboriginal right to fish there. Even assuming that appellants can establish a long history of fishing in the Columbia River, that aboriginal right has been extinguished by Congress.

10. *See Halbert v. United States*, 283 U.S. 753, 51 S.Ct. 615, 75 L.Ed. 1389 (1931).

11. The Wahkiakum is neither a signatory, nor a political successor to a signatory, to any ratified treaty with the United States. The only treaty which the Wahkiakum did sign (dated August 8, 1851) was never ratified by the United States Senate. The Wahkiakum participated in other negotiations, including those which led to the Treaty of Olympia, but all negotiations failed to produce a ratified treaty between the Wahkiakum and the United States. Thus, the Wahkiakum possesses no treaty rights of its own, but can only claim through affiliation.

12. Whether or not an aboriginal right exists would be a question of fact to establish continuous exercise of the right since before pre-treaty times. Because we decide that the claimed right was extinguished, it is unnecessary to establish that there had been such a right in fact. Plaintiffs' brief assumed the existence of an "aboriginal right to fish" separate from land ownership or treaty recognition. An aboriginal right to fish has been recognized only in the context of interpretation of a ratified treaty or federal statute, where courts have held that

Indian title based on aboriginal possession is a permissive right of occupancy; it may be extinguished by the federal government at any time without any legally enforceable obligation to compensate the Indians. *Tee-Hit-Ton Indians v. United States*, 348 U.S. 272, 279, 75 S.Ct. 313, 317, 99 L.Ed. 314 (1955); *United States v. Gemmill*, 535 F.2d 1145, 1147 (9th Cir.), *cert. denied*, 429 U.S. 982, 97 S.Ct. 496, 50 L.Ed.2d 591 (1976). The only relevant question is whether Congress intended to extinguish the Indian title. *United States v. Gemmill, id.*, at 1148.

Assuming that the Wahkiakum possessed an aboriginal fishing right,[12] we find that Congress intended that all Wahkiakum rights, including their fishing right, be extinguished. The Act of August 24, 1912 and its legislative history manifest this congressional intent. The Act provided for payment of a sum of money to the members of the Wahkiakum in settlement of all claims against the United States for the lands described in an unratified treaty signed by the Wahkiakum on August 8, 1851.[13] The record shows that this sum was accepted by the then living Wahkiakum.

aboriginal fishing rights were impliedly reserved to the Indians. *See Tlingit and Haida Indians of Alaska v. United States*, 389 F.2d 778, 786, 182 Ct.Cl. 130 (1968); *see also Menominee Tribe of Indians v. United States*, 391 U.S. 404, 88 S.Ct. 1705, 20 L.Ed.2d 697 (1968); *United States v. Michigan*, 471 F.Supp. 192 (W.D.Mich.1979). In holding that appellants' rights were extinguished, we do not necessarily agree that there can be any aboriginal fishing right in the context of a tribe which no longer holds title to any lands and is not a signatory to any ratified treaty.

13. The Act of August 24, 1912, 37 Stat. 518, 535 provides:

[T]hat there be paid to the Wahkiakum Band of Chinook Indians of Washington the sum of seven thousand dollars, to be apportioned among those now living and the lineal descendants of those who may be dead, by the Secretary of the Interior, as their respective rights may appear; ... Provided, that said Indians shall accept said sum, or their respective portions thereof, in full satisfaction of all demands or claims against the United States for the lands described in the agree-

While it may be argued that this payment was recognized dispossession of tribal lands only and not of other tribal rights, it is clear from the legislative history that Congress believed that all of the tribal rights had already been extinguished. In the unratified treaty of August 8, 1851, the Wahkiakum had attempted to reserve the right to occupy their old homes, to cut timber on the ceded lands and to fish in the Columbia River.[14] According to Senate Report No. 503 which accompanied the Act of August 24, 1912, these rights, the lands ceded by the unratified treaty and the reserved lands had all been taken by the government without compensation, and officers of the Indian Department were urging that some compensation be made.[15] Therefore, we conclude that Congress passed the Act of August 24, 1912, providing the payment to the Wahkiakum, in order to express congressional intent that all Wahkiakum rights, including fishing rights, be extinguished.

## CONCLUSION

Finding as a matter of law that the Treaty of Olympia does not provide treaty protection for traditional Wahkiakum fishing grounds and that any aboriginal Wahkiakum fishing rights were extinguished by the Act of August 24, 1912, we AFFIRM the summary judgment.

14. S.Rep. No. 503, 62nd Cong., 2d Sess. 3 (1912).

15. *Id.*

ments or unratified treaties between the United States and said Indians dated, ... August eighth, eighteen hundred and fifty-one.