928 F.2d 1496
 19 Fed.R.Serv.3d 1
 CONFEDERATED TRIBES OF the CHEHALIS INDIAN RESERVATION,
Shoalwater Bay Indian Tribe, Chinook Indian Tribe, Cowlitz
Indian Tribe, Lillian Payne Penn Pullen, Philip Ward, Leo
Williams, Edward E. Claplanhoo, Glenn F. Penn, Iola Mary
Penn Williams, Helen Sanders, Leda Anderson, and Gloria
Brown, Plaintiffs-Appellants,
v.
Manuel LUJAN, United States Secretary of the Interior, James
Burnley, United States Secretary of
Transportation, Defendants-Appellees.
 No. 90-35192.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Oct. 5, 1990.
Decided April 3, 1991.
As Amended May 23, 1991.
 As Amended on Denial of Rehearing
and Rehearing En Banc June 13, 1991.
 
 Dennis J. Whittlesey & Joseph S. Gerbasi of Collier, Shannon & Scott, Washington, D.C., and Jill A. Salmi, Seattle, Wash., for plaintiffs-appellants.
 Richard B. Stewart, David C. Shilton, Thornton Withers Field, and Jacques B. Gelin, U.S. Dept. of Justice, Washington, D.C., for defendants-appellees.
 Richard Reich, Taholah, Wash., for amicus curiae Quinault Indian Nation.
 Appeal from the United States District Court for the Western District of Washington.
 Before SKOPIL, O'SCANNLAIN and FERNANDEZ, Circuit Judges.
 SKOPIL, Circuit Judge:
 
 
 1
 We are asked on this appeal to determine if the district court properly dismissed an action brought by various groups of Indians against federal officials. These Indians challenge the United States' continuing recognition of the Quinault Indian Nation as the sole governing authority for the Quinault Indian Reservation. The district court dismissed the action after concluding that the Quinault Nation is an indispensable party that cannot be joined in the action. 129 F.R.D. 171. We affirm.
 
 FACTS AND PRIOR PROCEEDINGS
 
 2
 This controversy is rooted in the treaty negotiations conducted at the Chehalis River Treaty Council in 1855. There, the United States, represented by Governor Isaac Stevens, sought to place all coastal and interior Indian tribes of the Olympic Peninsula onto a single reservation. All but two tribes refused to accept the United States' proposal. The Quinault and the Quillehute signed the Treaty of Olympia. A reservation was established under the terms of the treaty.
 
 
 3
 The treaty reservation proved to be inadequate for the needs of the Quinault and Quillehute Tribes. As a result, President Grant issued the Executive Order of November 4, 1873, enlarging the reservation and providing that it be "for the use of the Quinault, Quillehute, Hoh, Quit, and other tribes of fish-eating Indians on the Pacific coast." Thus, by treaty and executive order, various tribes of the Pacific coast became affiliated with the Quinault. See Wahkiakum Band of Chinook Indians v. Bateman, 655 F.2d 176, 178-79 (9th Cir.1981) (reviewing history of the Quinault Indian Reservation).
 
 
 4
 Several of these affiliated tribes and individual tribal members filed this action seeking to enjoin federal officials from "dealing with the Quinault Indian Nation ... as the governing body of the Quinault Indian Reservation." They also seek judgment "declaring that the [plaintiffs] have equal rights in the Reservation, are entitled to be treated equally as federally recognized Indian tribes by [defendants], and that the governing body of the Reservation must be constituted so as to reflect those rights and the rights of all Indians who are allotted at the Reservation, including the individual plaintiffs."
 
 
 5
 The United States, on behalf of the federal officials, responded by moving to dismiss the action on the ground that the district court lacked authority to decide the controversy. Specifically, the United States contended that (1) the district court lacks subject matter jurisdiction; (2) the action is barred by a statute of limitations; (3) the action raises a political question not justiciable by federal courts; (4) plaintiffs failed to exhaust administrative remedies; and (5) plaintiffs failed to join an indispensable party, the Quinault Indian Nation. The district court ruled only on the last ground, holding that "plaintiffs have indeed failed to name an indispensable party in this suit, and therefore the government succeeds in its motion to have the case dismissed."
 
 DISCUSSION
 
 6
 Whether a non-party is "indispensable" is determined by application of Federal Rule of Civil Procedure 19. Under that rule, the district court must first determine if an absent party is "necessary" to the action; then, if that party cannot be joined, the court must determine whether the party is "indispensable" so that in "equity and good conscience" the action should be dismissed. Makah Indian Tribe v. Verity, 910 F.2d 555, 558 (9th Cir.1990). The district court's decision to dismiss an action based on the absence of an indispensable party is reviewed for an abuse of discretion. Id. at 557.
 
 A. Necessary Party
 
 7
 There is no precise formula for determining whether a particular non-party is necessary to an action. See Bakia v. County of Los Angeles, 687 F.2d 299, 301 (9th Cir.1982). "The determination is heavily influenced by the facts and circumstances of each case." Id. Nevertheless, Rule 19(a) contemplates a two-part analysis to aid in determining if an absent party is necessary. First, the court must consider if complete relief is possible among those parties already in the action. Second, the court must consider whether the absent party has a legally protected interest in the outcome of the action. See Makah Indian Tribe, 910 F.2d at 558.
 
 
 8
 We conclude that the Quinault Nation is a necessary party to the action for the reasons recognized by the district court. First, success by the plaintiffs in this action would not afford complete relief to them. Judgment against the federal officials would not be binding on the Quinault Nation, which could continue to assert sovereign powers and management responsibilities over the reservation. Second, the Quinault Nation undoubtedly has a legal interest in the litigation. Plaintiffs seek a complete rejection of the Quinault Nation's current status as the exclusive governing authority of the reservation. Even partial success by the plaintiffs could subject both the Quinault Nation and the federal government to substantial risk of multiple or inconsistent legal obligations.
 
 
 9
 Thus, the district court properly concluded that "[t]he Tribe is most certainly a party whose interests are affected, and in whose absence complete relief may not be afforded." That conclusion is entirely consistent with other decisions where courts have concluded that Indian tribes are necessary parties to actions affecting their legal interests. See, e.g., McClendon v. United States, 885 F.2d 627, 633 (9th Cir.1989) (Indian tribe is a necessary party to an action seeking to enforce a lease agreement signed by the tribe); Enterprise Mgt. Consultants, Inc. v. United States, 883 F.2d 890, 893 (10th Cir.1989) (Indian tribe is a necessary party to an action seeking to validate a contract with the tribe); Wichita and Affiliated Tribes of Oklahoma v. Hodel, 788 F.2d 765, 774 (D.C.Cir.1986) (Indian tribe's beneficiary interest in a trust makes it a necessary party to an action by a minority tribe seeking to obtain redistributions of future income).
 
 B. Indispensable Party
 
 10
 Generally, a necessary non-party will be joined as a party. Fed.R.Civ.P. 19(a). Indian tribes, however, are sovereign entities and are therefore immune from nonconsensual actions in state or federal court. McClendon, 885 F.2d at 629. The parties here agree that the Quinault Nation has not waived its immunity and accordingly cannot be joined in this action. Consequently, our next step is to determine if the district court properly concluded that the Quinault Nation is an indispensable party so that the action cannot in " 'equity and good conscience' " proceed in its absence. Fed.R.Civ.P. 19(a).
 
 
 11
 Rule 19(b) provides a four-part test to determine whether a non-party is indispensable to an action. Some courts have noted, however, that when the necessary party is immune from suit, there is very little need for balancing Rule 19(b) factors because immunity itself may be viewed as the compelling factor. See Enterprise Mgt. Consultants, 883 F.2d at 894 (citing Wichita and Affiliated Tribes, 788 F.2d at 777 n. 13). We have nonetheless consistently applied the four-part test to determine whether Indian tribes are indispensable parties. See Makah Indian Tribe, 910 F.2d at 560; Lomayaktewa v. Hathaway, 520 F.2d 1324, 1326 (9th Cir.1975), cert. denied, 425 U.S. 903, 96 S.Ct. 1492, 47 L.Ed.2d 752 (1976).
 
 
 12
 Rule 19(b) provides that the factors to be considered to determine whether an action should be dismissed because a non-party is indispensable are: (1) prejudice to any party or to the absent party; (2) whether relief can be shaped to lessen prejudice; (3) whether an adequate remedy, even if not complete, can be awarded without the absent party; and (4) whether there exists an alternative forum. See Makah Indian Tribe, 910 F.2d at 560. The district court applied these four factors and concluded that three of the four factors favored dismissal of the action. Specifically, the court reasoned that a judgment in favor of the plaintiffs would clearly prejudice the Quinault Nation because it would presumably alter the Quinault's existing authority to govern the reservation. The court concluded that no relief could be fashioned to avoid that prejudice and that no compromise position would satisfy plaintiffs without prejudice to the Quinault Nation. The court expressed sympathy that plaintiffs lacked a qualified forum but nevertheless concluded that "it cannot ignore the rule of law on joinder of parties."
 
 
 13
 We agree with the district court. The prejudice to the Quinault Nation if the plaintiffs are successful stems from the same legal interests that makes the Quinault Nation a necessary party to the action. See Enterprise Mgt. Consultants, 883 F.2d at 894 n. 4 (prejudice test under Rule 19(b) is essentially the same as the inquiry under Rule 19(a)); Northrop Corp. v. McDonnell Douglas Corp., 705 F.2d 1030, 1043 n. 15 (9th Cir.) (same), cert. denied, 464 U.S. 849, 104 S.Ct. 156, 78 L.Ed.2d 144 (1983). There is no partial or compromise remedy that will not prejudice the Quinault Nation.
 
 
 14
 Appellants nevertheless argue that the Quinault Nation will not be prejudiced if the action proceeds because a favorable judgment would only "fulfill rights guaranteed by prior decisions of federal courts." They further contend that affording the Quinault Nation "an opportunity to intervene constitutes a sufficient attempt to shape relief to lessen any possible prejudice." Moreover, they contend that the United States could adequately represent the Quinault Nation's interests. Finally, appellants argue that dismissing their action impermissibly precludes relief because no other forum is available to them.
 
 
 15
 We reject appellants' argument that the Quinault Nation will not be prejudiced because the action seeks only to enforce prior decisions. We have found no decisional law which specifically addresses the authority of the Quinault Nation to govern the Quinault Indian Reservation. The authorities cited by the appellants involve only the adjudication of individual member's rights. See Halbert v. United States, 283 U.S. 753, 756-60, 51 S.Ct. 615, 616-17, 75 L.Ed. 1389 (1931) (members of affiliated tribe are among those entitled to allotments on the Quinault Reservation); Williams v. Clark, 742 F.2d 549, 554 (9th Cir.1984) (members of affiliated tribe are permissible devisees of Quinault Reservation lands under the Indian Reorganization Act), cert. denied, 471 U.S. 1015, 105 S.Ct. 2017, 85 L.Ed.2d 299 (1985). At any rate, we do not need to address the merits of the underlying controversy except to conclude that the Quinault Nation might be prejudiced if the action was allowed to proceed.
 
 
 16
 We also reject appellants' theory that the Quinault Nation could minimize the potential prejudice by intervening in the action and asserting its interests. See Makah Indian Tribe, 910 F.2d at 560 (the ability to intervene if it requires waiver of immunity is not a factor that lessens prejudice). Similarly, the United States cannot adequately represent the Quinault Nation's interest without compromising the trust obligations owed to the plaintiff tribes. See id. (potential intertribal conflicts means the United States cannot properly represent any of the tribes). Finally, the "lack of an alternative forum does not automatically prevent dismissal of a suit." Id. Courts have recognized that a plaintiff's interest in litigating a claim may be outweighed by a tribe's interest in maintaining its sovereign immunity. See Enterprise Mgt. Consultants, 883 F.2d at 894 (" 'dismissal turns on the fact that society has consciously opted to shield Indian tribes from suit without congressional or tribal consent.' ") (quoting Wichita and Affiliated Tribes, 788 F.2d at 777).
 
 CONCLUSION
 
 17
 The district court did not abuse its discretion in dismissing this action pursuant to Rule 19.
 
 
 18
 AFFIRMED.
 
 
 19
 O'SCANNLAIN, Circuit Judge, concurring in part and dissenting in part:
 
 
 20
 The majority's analysis has two parts. First, the majority concludes that the Quinault Indians are a necessary and indispensable party under Rule 19; the court then concludes that because the Nation cannot be joined for reasons of sovereign immunity, the suit must be dismissed. While I agree that some of plaintiffs' claims should have been dismissed, I am not persuaded that dismissal of the complaint as a whole was proper. I therefore can concur in only part of the court's judgment. Moreover, because I believe that the majority has adopted a Draconian and overbroad interpretation of the compulsory joinder rule--which unlike sovereign immunity is an equitable rule of discretion--I respectfully dissent from the majority's reasoning.
 
 
 21
 * As the majority explains, Rule 19 has two pertinent parts. Rule 19(a) prescribes standards for determining whether a non-party is "necessary" to the litigation, and Rule 19(b) prescribes standards for determining whether a non-party is "indispensable," so that litigation cannot proceed in that non-party's absence.[1]A
 
 Rule 19(a) states that a non-party:
 
 22
 who is subject to service of process and whose joinder will not deprive the court of jurisdiction over the subject matter of the action shall be joined as a party in the action if (1) in the person's absence complete relief cannot be accorded among those already parties, or (2) the person claims an interest relating to the subject of the action and is so situated that the disposition of the action in the person's absence may (i) as a practical matter impair or impede the person's ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of the claimed interest.
 
 
 23
 Fed.R.Civ.P. 19(a). Applying these standards to the Quinaults, the majority concludes that they are a necessary party. I disagree.
 
 
 24
 * First, the majority reasons that the plaintiffs' success in this action would not afford them "complete relief" without joinder of the Quinaults. The court's opinion offers a one-sentence explanation: "Judgment against the federal officials would not be binding upon the Quinault Nation, who could continue to assert sovereign powers and management responsibilities over the reservation." Ante at 1498. It is, of course, true that judgment against the named defendants would not bind the Quinaults--in the same sense that judgment against a named defendant can never bind a non-party.[2] That observation is definitional, but it says nothing about the unavailability of relief within the meaning of Rule 19(a). The plaintiffs have alleged that federal officials have "denied their rights in the Reservation," have failed to recognize their right "to be treated equally as federally recognized Indian tribes," and have improperly recognized the Quinaults as "the exclusive governing body of the Reservation." Complaint at pp 31, 33, 43; see also id. at pp 21-51 (alleging six causes of action). It is not clear why declaratory or injunctive relief rendered against the named defendants on these claims would not be "complete" within the relevant level of generality.
 
 
 25
 The Confederated Tribes probably have no illusions that success in this action will afford them complete relief from all their troubles with the Quinaults, but defining "complete relief" in such expansive terms deprives it of meaning. The relevant question for Rule 19(a) must be whether success in the litigation can afford the plaintiffs the relief for which they have prayed. Again, the "completeness" of relief must be analyzed within the relevant level of generality: the four corners of the complaint.[3]
 
 
 26
 The majority places considerable weight on this circuit's recent decision in Makah Indian Tribe v. Verity, 910 F.2d 555 (9th Cir.1990), but Makah is clearly distinguishable. The plaintiff Indians in Makah sought to force the government to reallocate a limited number of fishing allotments. A panel of this circuit affirmed the district court's dismissal of the suit because the plaintiff tribe had failed to join the twenty-three other tribes which possessed allotted rights. As the court explained:
 
 
 27
 The [district] court, viewing the 1987 harvest as a trust fund, held that it could not grant complete relief to the Makah because it would violate the treaty rights of other tribes. It held the absent tribes had an interest in the suit because "any share that goes to the Makah must come from [the] other tribes."
 
 
 28
 Makah, 910 F.2d at 559 (quoting district court order) (emphasis added). It is appropriate to dispose of cases like Makah through Rule 19 because in such circumstances the court quite literally cannot give the plaintiff the interest that it seeks without simultaneously taking that interest away from the absent non-party. By contrast, the Confederated Tribes seek to vindicate rights to which they allege all Indians on the Quinault Reservation are entitled. There is no comparable "trust fund" or limited resource at issue in this case; here, there is "no pie to carve up."
 
 
 29
 The Makah court itself recognized this distinction. At the same time that the court affirmed dismissal of the plaintiffs' challenge to the fishing allotments, it reversed the district court's dismissal of their challenge to the administrative process that determines those allotments. The court held that an adjudication of these "procedural claims" could still be effective and would not prejudice the absent tribes "because all of the tribes have an equal interest in an administrative process that is lawful." Id.
 
 
 30
 The ruling that the Confederated Tribes seek would likewise be an adjudication of "procedural," rather than proprietary, claims. They seek--at least in part, if not entirely--a declaration and enforcement of their rights in the governmental processes that most immediately affect their lives. All the resident tribes of the Quinault Reservation have an equal interest in a fair and lawful administration of these processes; none would be legitimately prejudiced by a judgment regarding their respective rights under the laws and treaties that govern the reservation.[4]
 
 2
 
 31
 The majority's determination that the Quinaults have an interest at risk under Rule 19(a)(2) is similarly overbroad. The court's opinion asserts that "the Quinault Nation undoubtedly has a legal interest in the litigation. Plaintiffs seek a complete rejection of the Quinault Nation's current status as the exclusive governing authority of the reservation." Ante at 1498. Certainly, on one level of analysis, an enhancement of the standing of the Confederated Tribes relative to that of the Quinaults must be viewed as an erosion of the Quinaults' current status, but to assert that the Quinaults have a legally protectable interest for that reason sufficient to make them a necessary party is to stretch the directive of Rule 19(a) very broadly indeed. It is indisputable that if the plaintiffs prevail, the Quinaults' "interests," broadly defined, will suffer. The relevant inquiry for Rule 19(a), however, must be whether cognizable legal rights of the absent non-party will be prejudiced by the suit's continuation.[5] "Prejudice to one's self-interest" and "prejudice to one's legally protected interests" are not synonymous.[6] An application of compulsory joinder principles as broad as the majority's would force dismissal of virtually every case in which the self-interest of a non-party is adversely affected and the non-party cannot be joined.
 
 
 32
 More importantly, the court's assertion that the plaintiffs seek "a complete rejection" of the Quinaults' "current status" both distorts and prejudges the plaintiffs' claim. What the plaintiffs seek is not a rejection of the Quinaults' current status but a declaration that the Quinaults are not and never have been entitled to that status. If the former were the case, then presumably the majority would be correct in concluding that the Quinaults have a vested legal interest and that Rule 19(a) applies, but to reach that same result when the plaintiffs seek a declaratory judgment is to give the Quinaults the benefit of an unfair bootstrap. The court is saying that whether or not the Quinaults actually have a right to their current status, they say that they do, and that is enough to qualify as a protectable interest under Rule 19(a)(2).[7]
 
 
 33
 The majority's final argument under Rule 19(a)(2) is that "[e]ven partial success by the plaintiffs could subject both the Quinault Nation and the federal government to substantial risk of multiple or inconsistent legal obligations." Ante at 1498. This sentence, which stands alone without reasoning or analysis, is cryptic. Again, unlike Makah, the controversy here does not involve a limited fund or resource. Vindicating any of the asserted rights of the Confederated Tribes would take nothing from the Quinaults (in any non-relative sense) and certainly nothing which they might later be asked to give to someone else. More importantly, the concern of the Rule is to protect "persons already parties " from the risk of inconsistent legal obligations. Fed.R.Civ.P. 19(a)(2)(ii) (emphasis added). The Quinaults are not already a party; therefore, any risk to them on this score is irrelevant. I respectfully suggest that the majority has simply misread the Rule.
 
 B
 
 34
 Having determined that the Quinaults are a necessary party, the majority properly proceeds to determine whether they may be joined. The majority also correctly concludes that because they have sovereign immunity and have not consented to suit, they may not be. The court then proceeds to determine whether the Quinaults are an "indispensable" party within the meaning of Rule 19(b); but here too the analysis loses force.[8]
 
 
 35
 Rule 19(b) states that if a necessary party cannot be joined,
 
 
 36
 the court shall determine whether in equity and good conscience the action should proceed among the parties before it, or should be dismissed, the absent person being thus regarded as indispensable. The factors to be considered by the court include: first, to what extent a judgment rendered in the person's absence might be prejudicial to the person or those already parties; second, the extent to which, by protective provisions in the judgment, by the shaping of relief, or other measures, the prejudice can be lessened or avoided; third, whether a judgment rendered in the person's absence will be adequate; fourth, whether the plaintiff will have an adequate remedy if the action is dismissed for non-joinder.[9]
 
 
 37
 In applying these four factors, the district court concluded that the first three counsel dismissal of the suit. The majority endorses that determination, but in so doing, its reasoning, in my view, exhibits the same infirmities as its Rule 19(a) analysis.
 
 
 38
 * First, the majority adopts the district court's reasoning that "a judgment in favor of the plaintiffs would clearly prejudice the Quinault Nation because it would presumably alter the Quinault[s'] existing authority to govern the reservation." Ante at 1499-1500. By equating "alteration" of the Quinaults' status with "prejudice" of their legal rights, the majority once again interprets the Quinaults' protectable interests too broadly, viewing "interests" in extra-legal terms. Moreover, by implicitly legitimizing the Quinaults' "existing authority to govern," the majority again prejudges the very substance of the plaintiffs' claim.[10]
 
 2
 
 39
 Second, the majority adopts the district court's conclusion that "no relief could be fashioned to avoid that prejudice and that no compromise position would satisfy [the] plaintiffs without prejudice to the Quinault Nation." Ante at 1499. Without supporting reasoning or explanation, the majority insists that "[t]here is no partial or compromise remedy that will not prejudice the Quinault Nation." Id. at 1499. It is difficult to find these pronouncements persuasive without any discussion of the nature or substance of the plaintiffs' claims. When facing such a complicated complaint, how can a court be so sure--on the basis of the pleadings alone--that protective provisions cannot be worked into a final judgment to avoid unfair prejudice? Assuming that the plaintiffs prevail, why would the court be unable to fashion relief in a manner that would avoid prejudice to any legitimate rights of the Quinaults? The majority does not answer these questions.
 
 3
 
 40
 With respect to the third factor, whether a judgment rendered in the Quinaults' absence would be adequate, the court's opinion is largely silent. The implicit argument is a non sequitur. My colleagues appear to suggest that because the Quinaults are immune from suit, there can be no effective relief. The plaintiffs, however, are not suing the Quinaults; they are suing the named federal officials, and the relief they seek would be summoned entirely from the hands of those officials. The Quinaults do not have to be a party in order for the requested relief to be adequate.[11]
 
 4
 
 41
 The majority admits that the fourth factor weighs heavily in favor of the plaintiffs. Given the absence of an alternative forum, proceeding to the merits in this action is the plaintiffs' only hope of obtaining an adequate remedy. In my view, this single factor makes dismissal of the suit so harsh that it may outweigh the other three factors combined.[12]
 
 5
 
 42
 Finally, Rule 19(b) states that the applicable standard by which to consider all four of its factors is whether "in equity and good conscience the action should proceed among the parties already before [the court]." I believe that under this standard the present action clearly should proceed and that a better question might be whether "in equity and good conscience" this action can be dismissed. Rule 19 does not grant absent non-parties a substantive legal right to joinder; it is an equitable rule of discretion, the purely pragmatic purpose of which is to effect justice in the immediate case. See Provident Tradesmens Bank & Trust Co., 390 U.S. at 116-25, 88 S.Ct. at 741-46 (Part II of the opinion). As we said in Makah, "[t]he inquiry is a practical one and fact specific, and is designed to avoid the harsh results of rigid application." Makah, 910 F.2d at 558 (citations omitted).
 
 
 43
 The rule is that if the merits of the cause may be determined without prejudice to the rights of necessary parties, absent and beyond the jurisdiction of the court, it will be done; and a court of equity will strain hard to reach that result. [Citations omitted.]
 
 
 44
 We refer to the rule established by these authorities because it illustrates the diligence with which courts of equity will seek a way to adjudicate the merits of a case in the absence of interested parties that cannot be brought in.... [T]he rule as stated is intended for the benefit of a plaintiff whose bill sets forth a cause of action which he should, if possible, be given an opportunity to prove....
 
 
 45
 Bourdieu v. Pacific W. Oil Co., 299 U.S. 65, 70-71, 57 S.Ct. 51, 53-54, 81 L.Ed. 42 (1936); see also Moore's Federal Practice p 19.01-1, at 19-20 (quoting Bourdieu ). Thus, even if a balancing of the Rule 19(b) factors were to favor dismissal, it is clear that when compulsory joinder presents a close question the court should err on the side of continuing the litigation. If necessary, the action can always be dismissed at a later date,[13] but dismissal now--with nowhere else for the plaintiffs to turn--terminates the asserted claims forever.[14]
 
 C
 
 46
 In short, I cannot agree with the majority's conclusion that the action was properly dismissed for failure to join the Quinault Nation. I do not believe that the Quinaults are either necessary or indispensable under Rule 19. At the very least, it is too early to tell if the Quinaults are such a party. The complaint alleges six causes of action, and without analyzing the substantive law behind these claims and the various possibilities for relief, one cannot fairly determine that the suit cannot proceed.
 
 II
 
 47
 To say that a Rule 19 dismissal is inappropriate begs the question of what is appropriate. The answer to that question depends on how one reads the plaintiffs' complaint. Although the complaint alleges six causes of action, they can be reduced to essentially three sorts of claims.
 
 
 48
 * Plaintiffs allege in their third cause of action that they are entitled to an injunction requiring defendant "to establish and recognize a governing body of the Reservation pursuant to the Indian Reorganization Act of June 18, 1934" and consistent with declaratory relief requested in other portions of their complaint. Complaint at p 37. Plaintiffs allege in their sixth cause of action that they are entitled to an injunction prohibiting the defendant from "considering ... applications for construction within the Reservation ... proposed by or on behalf of the Quinault Tribe." Id. at p 47.
 
 
 49
 I would affirm dismissal of these claims for reasons of non-justiciability. As defendants argued below, such claims present political questions that lie beyond the adjudicative powers of this court. To the extent that the plaintiffs seek a judgment declaring how the federal government should deal with them or the Quinaults as a forward-looking matter, they are asking this court for an impermissible encroachment upon the prerogatives of the other branches of government. The Constitution itself explicitly commits to Congress the task of "regulat[ing] Commerce ... with the Indian Tribes." U.S. Const. art. I, Sec. 8, cl. 3. Congress, in turn, has explicitly assigned "the management of all Indian affairs and of all matters arising out of Indian relations" to the Executive Branch. 25 U.S.C. Sec. 2 (1990). Indeed, in its seminal opinion in Baker v. Carr, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962), in which it recast the political question doctrine, the Supreme Court pointed to cases that question the status of Indian tribes as "representative" of political controversies inappropriate for judicial resolution. See Baker, 369 U.S. at 211, 215-17, 82 S.Ct. at 706, 709-10.[15]
 
 
 50
 I therefore concur in the court's judgment to the extent that it affirms dismissal of the third and sixth causes of action. I would affirm, however, on the alternative ground of nonjusticiability. See Lee v. United States, 809 F.2d 1406, 1408 (9th Cir.1987) ("We may affirm on any ground fairly supported by the record."), cert. denied sub nom. Lee v. Eklutna, Inc., 484 U.S. 1041, 108 S.Ct. 772, 98 L.Ed.2d 859 (1988).
 
 B
 
 51
 Plaintiffs allege in their first cause of action that "[t]he Quinault Tribe has never been lawfully and formally federally recognized as the exclusive governing body of the Reservation," and that plaintiffs "are entitled to judgment declaring that the Quinault Tribe is not the exclusive governing body of the Reservation." Complaint at pp 28, 32. They further allege that the defendants' favoring of the Quinaults denies "their rights in the Reservation" and that they "are entitled to judgment declaring that [the various tribes on the Reservation] have equal rights in the Reservation." Id. at pp 31, 33. Similarly, the plaintiffs allege in their fifth cause of action that the defendants "ha[ve] implemented and [are] enforcing the Indian Land Consolidation Act ... as though the Quinault Tribe is the exclusive governing body of the Reservation." Id. at p 43.
 
 
 52
 To the extent that the plaintiffs simply seek a declaration of their rights and of the scope of the defendants' authority under the Treaty of Olympia and more recent federal legislation, I believe that the district court's dismissal of their claims should be reversed and that their claims should be reinstated. The Declaratory Judgment Act, upon which the plaintiffs have alleged jurisdiction, provides that "[i]n a case of actual controversy within its jurisdiction, ... any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. Sec. 2201(a) (emphasis added).[16] The Confederated Tribes have insisted repeatedly, both in their briefs and during oral argument, that what they seek above all else is a declaration of previously recognized and adjudicated rights. I believe that the district court has both the jurisdiction and the obligation to provide that declaration.
 
 
 53
 Indeed, federal courts have been favorable to similar claims in the past. Nine years ago, in Wahkiakum Band of Chinook Indians v. Bateman, 655 F.2d 176 (9th Cir.1981), this court acknowledged its obligation to interpret the rights of Indian litigants under the Treaty of Olympia and associated laws. In that case, the court affirmed the district court's summary judgment denying the plaintiff Indians' plea for declaratory and injunctive relief, but the court parsed the relevant laws and declared the parties' rights under those laws in the process. Sixty years ago, in Halbert v. United States, 283 U.S. 753, 51 S.Ct. 615, 75 L.Ed. 1389 (1930), the Supreme Court interpreted the Treaty of Olympia and associated laws and granted declaratory relief to a group of Indians seeking "to establish and enforce asserted rights to allotments ... in the Quinaielt [sic] Indian Reservation." 283 U.S. at 755, 51 S.Ct. at 615.[17]
 
 
 54
 In short, to the extent that the plaintiffs seek a declaration of what their rights are as opposed to what their rights should be, their claims appear to be justiciable, within the jurisdiction of the court, and not dependent upon the courtroom presence of the Quinaults. I therefore dissent from the majority's affirmance of the district court's dismissal of the first and fifth causes of action.
 
 C
 
 55
 The third group of claims is the most troubling. In numerous statements sprinkled throughout their complaint, the plaintiffs have alleged violations of "rights" in the vaguest of terms. They have neglected to state with any specificity the substantive law upon which these claims are based. Presumably, this court could affirm dismissal of these allegations for failure to state a claim, but liberal pleading rules counsel against that approach. See Fed.R.Civ.P. 15(a) ("a party may amend the party's pleading only by leave of court or by written consent of the adverse party; and leave shall be freely given when justice so requires"); see, e.g., United States v. Hougham, 364 U.S. 310, 316, 81 S.Ct. 13, 18, 5 L.Ed.2d 8 (1960) (Rule 15 is a "liberal rule[ ] governing the amendment of pleadings" and "was designed to facilitate the amendment of pleadings except where prejudice to the opposing party would result"); Conley v. Gibson, 355 U.S. 41, 48, 78 S.Ct. 99, 103, 2 L.Ed.2d 80 (1957) ("The Federal Rules reject the approach that pleading is a game of skill in which one misstep by counsel may be decisive to the outcome.").
 
 
 56
 I believe that a fair reading of the complaint suggests that the plaintiffs may mean to raise civil rights claims, and if that is their intent, the district court surely should have allowed an opportunity to amend. The extraordinary judicial interest in vindicating civil rights, the absence of an alternative forum, and the embryonic stage of this litigation all add considerable weight to what should be an already strong bias in favor of a liberal treatment of the pleadings. Cases implicating the civil rights of Indians are especially sensitive and complex, and they should not be dismissed prematurely. I therefore believe that this court should reverse dismissal of and reinstate those claims which may appear to be civil rights claims with specific instructions that the district court direct the plaintiffs to amend their complaint.
 
 D
 
 57
 Plaintiffs allege in their second cause of action that they "are entitled to a prohibitory injunction preliminarily and permanently enjoining defendant [Lujan] from recognizing and dealing with the Quinault Tribe as the exclusive governing body of the Reservation." Complaint at p 35. They similarly allege in their fourth cause of action that they are entitled to an injunction prohibiting the defendants from recognizing the Quinaults as the exclusive Reservation authority for matters dealing with forest management, forest roads, law and order, Indian lands, and natural resources. Id. at pp 39, 41.
 
 
 58
 To the extent that these claims seek an interpretation of the relevant federal laws and a declaration of the plaintiffs' rights under those laws, I would apply the analysis suggested in part II-B above and reinstate their claims. To the extent, however, that these claims seek "prospective" relief that would encroach upon the discretion of Congress and the Secretary of the Interior, I would apply the analysis suggested under part II-A above and affirm dismissal for nonjusticiability.
 
 III
 
 59
 In sum, I concur in the majority's judgment insofar as it affirms dismissal of some of the plaintiffs' claims, but I cannot endorse the majority's reasoning as to those claims. Specifically, I concur in affirming dismissal of all allegations the adjudication of which would require judicial encroachment upon the discretionary authority of the political branches of government.
 
 
 60
 I dissent from the majority's judgment insofar as it affirms dismissal of any other claims, and I dissent from the majority's interpretation and application of the compulsory joinder rule.
 
 
 
 [1]
 Our historical use of the terms "necessary" and "indispensable" in conjunction with Rule 19 provides some cause for confusion. Logically and in the vernacular, the two words are synonymous: if a party is truly "necessary" to an action, then presumably the action cannot proceed without that party; the party is thus "indispensable."
 In order for the distinction to make any sense in the context of Rule 19, therefore, we must mean something less than actual necessity when we speak of a "necessary party." Indeed, the current caption for Rule 19(a) does not use the term "necessary" but instead speaks of "Persons to be Joined if Feasible." Fed.R.Civ.P. 19(a). Persons who fit this definition are non-parties "whose joinder in the action is desirable " in the effort to ensure a just, informed, and fair result. Fed.R.Civ.P. 19 advisory committee's note on amended rule (emphasis added); see 7 C. Wright, A. Miller & M. Kane, Federal Practice and Procedure Sec. 1604, at 36 (2d ed. 1986) ("the necessary party label has been eliminated to emphasize that the real purpose of this rule is to bring before the court all persons whose joinder would be desirable for a just adjudication of the action"). These non-parties should be joined if possible, but they are not, truly speaking, "necessary parties" unless and until they satisfy the terms of Rule 19(b). See id. Sec. 1601, at 7-8 (identifying Shields v. Barrow, 58 U.S. (17 How.) 130, 139, 15 L.Ed. 158 (1855), as one source for our use of the terms "necessary" and "indispensable" in the joinder context and quoting language from the Court's opinion in that case that indicates that the Court meant something less than "necessary" by its use of that word).
 
 
 [2]
 See Provident Tradesmens Bank & Trust Co. v. Patterson, 390 U.S. 102, 110, 88 S.Ct. 733, 738, 19 L.Ed.2d 936 (1968); see also Reed, Compulsory Joinder of Parties in Civil Actions, 55 Mich.L.Rev. 327, 330-35 (1957); see generally Hazard, Indispensable Party: The Historical Origin of a Procedural Phantom, 61 Colum.L.Rev. 1254 (1961)
 
 
 [3]
 See 3A J. Moore & J. Lucas, Moore's Federal Practice p 19.07-1, at 19-93 to 98 (2d ed. 1990) [hereinafter Moore's Federal Practice ] ("it must be noted that complete relief refers to relief as between the persons already parties, and not as between a party and the absent person whose joinder is sought"), quoted in Eldredge v. Carpenters 46 N. Cal. Counties Joint Apprenticeship & Training Comm., 662 F.2d 534, 537 (9th Cir.1981), cert. denied, 459 U.S. 917, 103 S.Ct. 231, 74 L.Ed.2d 183 (1982); see also id. (citing, inter alia, Puyallup Indian Tribe v. Port of Tacoma, 717 F.2d 1251 (9th Cir.1983), cert. denied sub nom. Trans-Canada Enters. Ltd. v. Muckleshoot Indian Tribe, 465 U.S. 1049, 104 S.Ct. 1324, 79 L.Ed.2d 720 (1984) and three other Ninth Circuit cases)
 In Puyallup, an Indian tribe petitioned for declaratory relief to quiet title to a tract of land that was exposed after the Army Corps of Engineers altered the course of a navigable river. Before proceeding to the merits, the court noted and applied the established Ninth Circuit rule that an Indian tribe need not join either the federal or the state government in an action to protect its tribal lands--even though the federal government, as trustee, legally holds title to the tribe's realty and even though the state might challenge the tribe's title in a future action. See Puyallup, 717 F.2d at 1254-56.
 
 
 [4]
 Under the majority's holding, if the Bureau of Indian Affairs were suddenly to announce that henceforth the Sioux Nation of South Dakota shall have governing authority over the Quinault Indian Reservation, neither the Confederated Tribes nor the Quinaults would be able to challenge that ruling. Such a challenge would require joinder of the Sioux, who are immune from suit. Joinder of the Sioux, however, should be irrelevant to a challenge upon the authority of federal officials so to designate the Sioux. The majority's reasoning comes dangerously close to suggesting that Indians have less judicial recourse than other Americans against arbitrary exercises of federal power
 
 
 [5]
 See Makah, 910 F.2d at 558 ("the court must determine whether the absent [non-]party has a legally protected interest in the suit.") (emphasis in original); Moore's Federal Practice p 19.07[2.-0], at 19-99 ("The 'interest' ... that makes an absent person a party needed for just adjudication, must be a legally protected interest, and not merely a financial interest or interest of convenience.")
 
 
 [6]
 For example, we would not regard every consumer of electricity to be a necessary party to every judicial proceeding that involves the local public utility. Even though every consumer's "interests" might be affected by the outcome, that does not mean that every consumer has a vested legal interest in the litigation
 This analogy is not as far-fetched as it might seem. Just like these fictitious electricity consumers, the Confederated Tribes have an interest in a fair allocation of their community's power--only in this case, the power is political rather than electrical. Claiming that the current allocation of power is fundamentally unfair and inconsistent with federal law, the Confederated Tribes have undertaken to sue the government, a "power source" roughly analogous to the utility. The majority has dismissed the Tribes' complaint for their failure to join others who also have an "interest" in political power.
 The reason why this result is unacceptable (and why the Makah result is not) is that the political power at issue, unlike fishing allotments, is an essentially public right. "In litigation involving the adjudication of public rights, non-parties who may be adversely affected by a decision in plaintiff's favor do not have a protectable interest which would require their joinder under Rule 19." Moore's Federal Practice p 19.07[2.-0], at 19-100 to 101 (footnote omitted). In addition to being a public right, political power is also a purely relative concept. If the plaintiffs have a worthy claim here, then this court should accommodate that claim--without worrying that the relative standing of the Quinaults may decline as a result.
 
 
 [7]
 The majority's confusion on this point stems from its implicit assumption that the present litigation somehow challenges the Quinaults' sovereign immunity and that such a challenge cannot proceed without the Quinaults' consent. Sovereign immunity, however, is not the issue here. The only issue is whether the Quinaults have a cognizable legal interest that absolutely requires their joinder under a practical-minded application of a discretionary federal rule. Sovereign immunity does not become a relevant consideration unless and until one first concludes the Quinaults' joinder is necessary under that rule. As Justice Harlan explained for a unanimous Supreme Court:
 To say that a court "must" dismiss in the absence of an indispensable party and that it "cannot proceed" without him puts the matter the wrong way around: a court does not know whether a particular person is "indispensable" until it has examined the situation to determine whether it can proceed without him.
 Provident Tradesmens Bank & Trust Co., 390 U.S. at 119, 88 S.Ct. at 743. Indeed, if anything, the Quinaults' sovereign immunity is only relevant here as a factor that weighs against compulsory joinder. See Fed.R.Civ.P. 19(a) (only a party "whose joinder will not deprive the court of jurisdiction over the subject matter of the action" can be deemed necessary); 19(b) (court must consider "whether the plaintiff will have an adequate remedy if the action is dismissed for nonjoinder").
 
 
 [8]
 Because I do not believe that the Quinaults are a necessary party under Rule 19(a), it follows that I do not believe that they are an indispensable party under Rule 19(b). Assuming for the sake of argument that they are a necessary party, I would then disagree with the majority's conclusion that they are indispensable
 
 
 [9]
 Before considering the Rule's four factors, the majority first points out the observation of some courts that "when the necessary party is immune from suit, there is very little need for balancing Rule 19(b) factors because immunity itself may be viewed as the compelling factor." Ante at 1499 (citing Enterprise Management Consultants, Inc. v. United States, 883 F.2d 890, 894 (10th Cir.1989) (citing Wichita & Affiliated Tribes v. Hodel, 788 F.2d 765, 777 n. 13 (D.C.Cir.1986))). It is important to clarify exactly what this observation means. Assuming that an immune non-party is truly "necessary" to the litigation, a weighing of equitable concerns is irrelevant because joinder is legally impossible without the non-party's consent. A non-party's immunity is therefore conclusive on whether that non-party may be joined without its consent, but immunity says nothing about a non-party's indispensability to the litigation
 Thus, if one concludes that joinder of an immune non-party is not necessary--as I would in this case--one still can (and logically must) conclude that the immune non-party is not indispensable to the suit: i.e., the litigation may proceed in the non-party's absence. See supra note 1 (discussing troubling use of terms "necessary" and "indispensable" in Rule 19 context).
 
 
 [10]
 As the majority correctly points out, the prejudice analysis under Rule 19(b) is essentially the same as the necessity analysis under Rule 19(a)(2)(i). See Ante at 1499 (citing Enterprise Management Consultants, 883 F.2d at 894 n. 4 (10th Cir.1989), and Northrop Corp. v. McDonnell Douglas Corp., 705 F.2d 1030, 1043 n. 15 (9th Cir.), cert. denied, 464 U.S. 849, 104 S.Ct. 156, 78 L.Ed.2d 144 (1983)). I therefore disagree with the majority's Rule 19(b) prejudice analysis for the same reasons that I disagree with its Rule 19(a) analysis
 
 
 [11]
 Thus, although accurate, the majority's observation that "a plaintiff's interest in litigating a claim may be outweighed by a tribe's interest in maintaining its sovereign immunity" is not relevant within the context of this case. This case does not pit the Confederated Tribes' interest in litigation against the Quinaults' interest in sovereign immunity. See supra note 7
 
 
 [12]
 See Anrig v. Ringsby United, 603 F.2d 1319, 1326 (9th Cir.1978) ("whether a judgment rendered in the person's absence will be adequate and whether the plaintiff will have an adequate remedy if the action is dismissed for nonjoinder" are "the most relevant factors proposed by Rule 19(b)" and the "most weighty in the circumstances of the case at bar")
 The district court itself acknowledged the harshness of dismissing this action: "Plaintiffs describe their procedural situation in this suit as a 'Catch-22.' While the court is sympathetic to plaintiffs' frustration at their inability to achieve jurisdiction over the party at the heart of the dispute, it cannot ignore the rule of law on joinder of parties." Confederated Tribes of the Chehalis Indian Reservation v. Lujan, 129 F.R.D. 171, 175 (W.D. Wash.1990) (order granting defendants' motion to dismiss).
 
 
 [13]
 A joinder question should be decided with reasonable promptness, but decision may properly be deferred if adequate information is not available at the time. Thus, the relationship of an absent person to the action, and the practical effects of an adjudication upon him and others, may not be sufficiently revealed at the pleading stage; in such a case it would be appropriate to defer decision until the action was further advanced
 Fed.R.Civ.P. 19 advisory committee's note on amendment to subdivision (b).
 
 
 [14]
 The 1966 advisory committee's note on general considerations for Rule 19 also supports a flexible application of compulsory joinder:
 Whenever feasible, the persons materially interested in the subject of an action ... should be joined as parties so that they may be heard and a complete disposition made. When this comprehensive joinder cannot be accomplished ... the case should be examined pragmatically and a choice made between the alternatives of proceeding with the action in the absence of particular interested persons, and dismissing the action.
 Even if the court is mistaken in its decision to proceed in the absence of an interested person, it does not by that token deprive itself of the power to adjudicate as between the parties already before it through proper service of process. But the court can make a legally binding adjudication only between the parties actually joined in the action. It is true that an action between the parties before the court may on occasion adversely affect the absent person as a practical matter, or leave a party exposed to a latter inconsistent recovery by the absent person. These are factors which should be considered in deciding whether the action should proceed, or should rather be dismissed; but they do not themselves negate the court's power to adjudicate as between the parties who have been joined.
 Fed.R.Civ.P. 19 advisory committee's note (emphasis added).
 
 
 [15]
 The Court did point out, however, that "there is no blanket rule" of nonjusticiability in cases involving the status of Indian tribes. Baker, 369 U.S. at 215, 82 S.Ct. at 709. Governmental actions that exceed Congress's authority over the Indians--as opposed to discretionary actions executed within that authority--may present justiciable questions: "[The courts] will not stand impotent before an obvious instance of a manifestly unauthorized exercise of power." Id. at 217, 82 S.Ct. at 710; see also United States v. Sandoval, 231 U.S. 28, 46, 34 S.Ct. 1, 5, 58 L.Ed. 107 (1913)
 This distinction--which represents the difference between a nonjusticiable challenge to the Constitution's delegation of powers on the one hand and a potentially justiciable challenge to government officials' interpretation of that delegation on the other--is critical to the case at bar. The Confederated Tribes' complaint appears to challenge both (a) the legitimacy of the defendants' exercise of their authority and (b) the legitimacy of substantive decisions clearly within the defendants' authority. The latter claims are nonjusticiable under Baker v. Carr, the former are not.
 
 
 [16]
 There appears to be little doubt that this is "a case of actual controversy within [the district court's] jurisdiction." Under 28 U.S.C. Sec. 1362, which the plaintiffs also cited in their complaint, "[t]he district courts ... have original jurisdiction of all civil actions, brought by any Indian tribe or band with a governing body duly recognized by the Secretary of the Interior, wherein the matter in controversy arises under the Constitution, laws, or treaties of the United States." The defendants admitted in their answer that the plaintiffs "are an Indian tribe ... with a governing body duly recognized by the Secretary of the Interior." Complaint at p 9; see Answer at p 9 (admitting claim)
 
 
 [17]
 Incidentally, the Halbert Court noted that the federal government had statutorily waived its sovereign immunity for that action and had consented to suit. The statute cited by the Halbert Court, which was originally passed at the turn of the century, was split in half by a subsequent Congress, and both halves remain in effect today. See 28 U.S.C. Sec. 1353 (conferring federal jurisdiction for allotment claims); 25 U.S.C. Sec. 345 (waiving federal sovereign immunity for allotment claims); see also Scholder v. United States, 428 F.2d 1123, 1126 (9th Cir.) (interpreting 25 U.S.C. Sec. 345 as "a limited consent by the United States to suit"), cert. denied, 400 U.S. 942, 91 S.Ct. 240, 27 L.Ed.2d 246 (1970). The plaintiffs have cited one of the extant halves of the old statute as a basis for jurisdiction in their complaint. Complaint at p 2 (citing 28 U.S.C. Sec. 1353). It is not clear, therefore, whether sovereign or official immunity would bar continuation of this suit on remand