CONFEDERATED TRIBES OF CHEHALIS INDIAN RESERVATION, Plaintiff–Appellant, Cross–Appellee,

and

Shoalwater Bay Indian Tribe, Plaintiff–Appellant,

v.

STATE OF WASHINGTON; William R. Wilkerson, individually and as Acting Director of the State of Washington Department of Fisheries; Frank R. Lockard, individually and as Director of the State of Washington Department of Game; Washington State Game Commission, Defendants–Appellees,

and

UNITED STATES of America, Plaintiff–Appellee,

v.

STATE OF WASHINGTON, Defendant– Appellee, Cross–Appellant.

Nos. 95–35370, 95–35371.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Aug. 6, 1996.

Filed Sept. 6, 1996.

Harold Chesnin, Mathews, Garlington–Mathews & Chesnin, Seattle, Washington; Jeffrey S. Schuster, Evergreen Legal Services, Seattle, Washington; for the plaintiffs-appellants-cross-appellee.

Jay D. Geck, Assistant Attorney General, Robert K. Costello, Sr. Assistant Attorney General, Olympia, Washington; Richard Reich, Office of the Reservation Attorney, Taholah, Washington; Jacques B. Gelin, United States Department of Justice, Washington, D.C., for the defendants-appellees.

Before WRIGHT, BEEZER and O'SCANNLAIN, Circuit Judges.

## OPINION

EUGENE A. WRIGHT, Circuit Judge:

This case involves claims by two Indian tribes in Southwest Washington to off-reservation fishing rights. The Shoalwater Bay Tribe and the Confederated Tribes of the Chehalis Indian Reservation have no such rights by treaty, but they assert that they have implied fishing rights arising from the executive orders creating their reservations. They also argue that they are entitled to the treaty fishing rights of the Quinault Tribe. Finally, they argue that they have extant fishing rights based on Chehalis aboriginal title. Allied against the Tribes on appeal are the United States, the State of Washington and the Quinault Tribe.

In its findings of fact and conclusions of law, the district court concluded that the Tribes' claims were not well-founded. We agree and affirm the judgment of the court. We also affirm the court's judgment on the question of the boundaries of the Chehalis Reservation.

## BACKGROUND

### A. Introduction

The Confederated Tribes of the Chehalis Indian Reservation ("Chehalis Tribe") occupy a reservation at the confluence of the Black and Chehalis Rivers in Southwest Washington. This reservation was created by secretarial order in 1864. Tribal membership includes persons descended from the Upper Chehalis Indians, and may also include descendants of the Lower Chehalis, Cowlitz and other tribes of Southwest Washington. The Shoalwater Bay Indian Tribe occupies a reservation on the north side of Willapa Bay (formerly Shoalwater Bay) on the Washington coast. The members are descendants of a small group of Indians of Chinook and Lower Chehalis ancestry who settled on the reservation, which was created by executive order in 1866.

### B. Historical Background

#### 1. Tribal Pre–Treaty History

The Chinook, Chehalis and Cowlitz Indians lived in Southwest Washington for centuries before the arrival of white settlers. They were considered "fish-eating" Indians; that is, their livelihood depended on fish and seafood. *Halbert v. United States*, 283 U.S. 753, 757, 51 S.Ct. 615, 616, 75 L.Ed. 1389 (1931). The Upper Chehalis Indians were primarily river fishermen, with principal fisheries in the Chehalis River drainage system. The Lower Chinook and Lower Chehalis fished both in marine waters and in rivers and streams near the coast.

#### 2. The Dart Treaties

By the 1850's, settlers had begun to encroach upon tribal lands. In 1851, Dr. Anson Dart, representing the United States, negotiated a series of treaties with the Chinook and other bands of Indians in the region to provide a reservation at Shoalwater Bay. His treaties contemplated fishing rights on the rivers emptying into the Bay. They were never ratified, however, and no lands or rights were reserved as a result of Dart's efforts.

### 3. The Chehalis River Council and Treaty of Olympia

In 1855, Governor Stevens of Washington Territory held a treaty council at the Chehalis River. Members of many bands of local Indians, including Chehalis, Chinook and Cowlitz Indians, attended. Stevens proposed a treaty whereby all tribes of the region would be removed to a reservation in Quinault Indian territory. Article III of the treaty guaranteed signing tribes "the right of taking fish at all usual and accustomed grounds and stations." Article VI allowed the President to consolidate the signing tribes with other "friendly tribes and bands." *See Wahkiakum Band of Chinook Indians v. Bateman,* 655 F.2d 176, 179 n. 6 (9th Cir. 1981).

The Indians living at Shoalwater Bay refused to sign because they wanted a separate reservation at the bay and objected to being relocated to unfamiliar Quinault territory. Similarly, representatives of the Upper Chehalis refused to sign because they wanted to stay on the Chehalis River and preferred a reservation there. The Quinault Tribe did sign, perhaps because the treaty guaranteed them a reservation where they were already living. The neighboring Quileute, Queets and Hoh Tribes eventually signed as well, and the Senate ratified the treaty in 1859. It is known both as the Treaty of Olympia and the Treaty with the Quinault.

Governor Stevens intended to renew treaty negotiations with the non-signing tribes, but his attention was diverted by other events, including the Civil War and the outbreak of an Indian war. No treaty was ever concluded with the Chehalis, Chinook or Cowlitz Tribes.

### 4. Orders Creating the Chehalis and Shoalwater Reservations

The flood of settlers into the region continued. In response, the government sought to set aside reservations for the Chehalis, Chinook and Cowlitz Indians at the locations requested at the Chehalis River Council. In 1860, Michael Simmons, a member of Stevens' treaty commission, wrote to the Superintendent of Indian Affairs for the Washington and Oregon Territory that:

The Upper and Lower Chehalis, the Cowlitz and Chinook Indians, numbering between seven and eight hundred, are not parties to the existing treaties, and are certainly entitled to the care of the government. They are in the immediate neighborhood of the settlements, living in most instances on the land of white settlers. I have selected a piece of ground adapted to their wants, and upon which I think it will be advisable to settle the Cowlitz and Upper Chehalis tribes. The Chinooks and Lower Chehalis should be located somewhere near the seashore, as their previous habits and mode of living render such a location necessary.

Letter from Simmons to Superintendent Geary, July 1, 1860.

Further discussions among government officials culminated in the establishment in 1864 of the Chehalis Reservation by order of the Secretary of the Interior. Two years later, President Johnson entered an order establishing the Shoalwater Bay Reservation. That order, written by hand on a map of the proposed reservation, reads:

Let the tract of land as indicated on the within diagram be reserved from sale and set apart for Indian purposes, as recommended by the Secretary of the Interior in his letter of the 18th instant, said tract embracing portions of sections 2 and 3 in township 14 north, range 11 west, Washington Territory.

### 5. Expansion and Allotment of the Quinault Reservation

In 1871, only Quinault Indians lived on the Quinault Reservation. Despite the provision of the Treaty of Olympia requiring the Quileute, Queets and Hoh to move to the reservation, these tribes remained at their traditional homes on the coast to the north. In 1872, Superintendent Milroy proposed that the reservation be enlarged so that these tribes, along with other Indians of the region, could be collected on the enlarged reservation. An executive order of 1873 enlarged the reservation:

In accordance with the provisions of the treaty with the Quinaielt and Quillehute

Indians, concluded July 1, 1855, and January 25, 1856 (Stats. at Large, vol. 12, p. 971), and to provide for other Indians in that locality, it is hereby ordered that the following tract of country in Washington Territory ... be withdrawn from sale and set apart for the use of the Quinaielt, Quillehute, Hoh, Quit, and other tribes of fish-eating Indians on the Pacific coast....

I Charles Kappler, *Indian Affairs: Laws and Treaties* 923 (1904).[1]

In 1911, Congress directed the Secretary of Interior to make allotments on the Quinault Reservation under the provisions of the allotment laws to "all members of the Hoh, Quileute, Ozette or other tribes of Indians of Washington who are affiliated with the Quinaielt and Quileute tribes in the [Treaty of Olympia] and who may elect to take allotments on the Quinault Reservation rather than on the reservations set aside for these tribes." The Supreme Court subsequently ruled that members of the Chehalis, Chinook and Cowlitz tribes were entitled to allotments on the Quinault reservation pursuant to this act and the 1873 executive order. *Halbert*, 283 U.S. at 758, 51 S.Ct. at 616–17.

### 6. Order Opening up Chehalis Reservation for Homesteading

In the late 1870's and early 1880's, local Indian officials sought to provide allotments for Indians living on the Chehalis Reservation. Because the executive order establishing the reservation contained no legal authority for allotment, the officials proposed that the Chehalis reservation land be restored to the public domain so that the Chehalis Indians could immediately obtain homesteads on the reservation under the homestead laws. This was done by executive order in 1886. The order opened up all but 471 acres of the reservation, which were withdrawn from sale and "set apart for the use and occupation of the Chehalis Indians." Two similar executive orders in 1908 and 1909 restored parts of this 471–acre parcel to provide additional homesteads for members of the tribe.

**1.** Quinaielt, Quillehute and Quit are variant spellings of Quinault, Quileute and Queets, respectively.

### C. Proceedings in District Court

The Tribes sued in district court for a determination of their rights to fish both on and off reservation. The district court consolidated the cases for the resolution of two issues: (1) what rights, if any, the Tribes have to fish free of state regulation in the Chehalis River system, the Grays Harbor systems, Willapa Bay, the rivers and streams emptying into Willapa Bay and waters adjacent to the Bay; and (2) how to allocate the catch of these two tribes. To determine the Chehalis Tribe's on-reservation fishing rights, the district court also addressed the issue of the current boundaries of the Chehalis Reservation.

The Tribes argued at trial before a magistrate judge that they had a right under the Treaty of Olympia to fish at Quinault usual and accustomed fishing grounds. They also argued that they had unextinguished aboriginal rights to fish, free from state regulation, at their usual and accustomed fishing grounds off the reservations. Finally, they argued that they had off-reservation fishing rights arising from the orders creating their reservations.

The district court adopted the magistrate judge's findings of fact and conclusions of law rejecting these claims. The court, however, did not adopt the judge's separate findings on the issue of the boundaries of the Chehalis reservation. It found that the reservation retained the same boundaries described in the 1864 order creating it, and had not been diminished by the 1886, 1908 and 1909 executive orders restoring reservation lands to the public domain.

### ANALYSIS

### A. Rights to Take Fish at Quinault Usual and Accustomed Places

■ The Tribes argue that the district court erred in concluding that they do not have a right to fish at the usual and accustomed fishing grounds of the Quinault Tribe pursuant to the Treaty of Olympia and the

spectively.

1873 executive order. We review de novo the district court's interpretation of treaties, statutes and executive orders. *See United States v. State of Washington,* 969 F.2d 752, 754–55 (9th Cir.1992), *cert. denied, Lummi Indian Tribe v. Washington,* 507 U.S. 1051, 113 S.Ct. 1945, 123 L.Ed.2d 651 (1993).

### 1. Indian Canons of Construction

■ Courts have uniformly held that treaties, statutes and executive orders must be liberally construed in favor of establishing Indian rights. *Montana v. Blackfeet Tribe of Indians,* 471 U.S. 759, 767, 105 S.Ct. 2399, 2404, 85 L.Ed.2d 753 (1985); *Parravano v. Babbitt,* 70 F.3d 539, 544 (9th Cir.1995), *cert. denied,* — U.S. ——, 116 S.Ct. 2546, 135 L.Ed.2d 1066 (1996). Any ambiguities in construction must be resolved in favor of the Indians. *Parravano,* 70 F.3d at 544. These rules of construction "are rooted in the unique trust relationship between the United States and the Indians." *Oneida County v. Oneida Indian Nation,* 470 U.S. 226, 247, 105 S.Ct. 1245, 1258, 84 L.Ed.2d 169 (1985).

■ The rules of construction, however, are of no help to the Tribes in their claim to Quinault fishing rights because of the countervailing interests of the Quinaults. The government owes the same trust duty to all tribes, including the Quinault. *See Nance v. EPA,* 645 F.2d 701, 711 (9th Cir.) (government has same fiduciary relationship with the Northern Cheyenne Tribe as it does with the Crow Tribe), *cert. denied, Crow Tribe of Indians v. EPA,* 454 U.S. 1081, 102 S.Ct. 635, 70 L.Ed.2d 615 (1981). We cannot apply the canons of construction for the benefit of the Tribes if such application would adversely affect Quinault interests. *See Hoopa Valley Tribe v. Christie,* 812 F.2d 1097, 1102 (9th Cir.1986) ("No trust relation exists which can be discharged to the plaintiff here at the expense of other Indians.").

### 2. "Affiliation" with the Quinault Tribe

■ In *United States v. Suquamish Indian Tribe,* 901 F.2d 772, 776 (9th Cir.1990), we held that a treaty signatory tribe may obtain the treaty fishing rights of another treaty signatory tribe only if the tribes merge or consolidate in a manner sufficient to combine their tribal or political structures. The Tribes concede that they never signed the Treaty of Olympia or any other treaty. They also concede that they have never merged or consolidated with any of the tribes that signed the Treaty.

They argue nonetheless that they are entitled to Quinault fishing rights through the interplay of the Treaty of Olympia and the 1873 executive order enlarging the Quinault Reservation. Article VI of the Treaty allowed the President to consolidate the treaty signatories with other "friendly tribes and bands." The 1873 executive order, in turn, expanded the Quinault Reservation for the use of "other tribes of fish-eating Indians on the Pacific coast." The Tribes contend that, through these provisions, they became "affiliated" with the treaty tribes for the purposes of obtaining Quinault fishing rights. They argue that the Supreme Court's decision in *Halbert,* 283 U.S. 753, 51 S.Ct. 615, commands this conclusion.

In *Halbert,* the Court held that Indians of the Chehalis, Chinook and Cowlitz Tribes were entitled to allotments on the Quinault Reservation pursuant to the 1911 Quinault Allotment Act, which allowed allotments "to all members of the Hoh, Quileute, Ozette or *other tribes of Indians* in Washington who are *affiliated* with the Quinaielt and Quileute Tribes in the [Treaty of Olympia]." 283 U.S. at 758, 51 S.Ct. at 616 (emphasis added). The Court reasoned that these Indians were "affiliated" with the treaty tribes through the consolidation provision of the Treaty and through the 1873 executive order. *Id.* at 759, 51 S.Ct. at 617. It noted that the Treaty secured to them "the right of taking fish at all usual and accustomed grounds." *Id.* at 760, 51 S.Ct. at 617.

*Halbert* does not support the conclusion that the Tribes themselves are entitled to Quinault fishing rights. That case was concerned only with allotment and addressed the rights of individual Indians, not tribal rights. *See Confederated Tribes of the Chehalis Indian Reservation v. Lujan,* 928 F.2d 1496, 1500 (9th Cir.1991) (*Halbert* involved "only the adjudication of individual member's rights").

The Tribes respond that this court's decision in *Wahkiakum Band of Chinook Indians v. Bateman*, 655 F.2d 176 (9th Cir.1981), also commands the conclusion that they are entitled to Quinault fishing rights through affiliation. There, the court rejected the Wahkiakums' claim to fishing rights at its own traditional fishing grounds under the Treaty of Olympia. In dictum, the court added that the Wahkiakums did have some rights to fish at the grounds of the treaty signatory tribes:

> As members of a tribe subsequently affiliated with the Quinault under the treaty, they are, however, entitled to share such rights as are granted to the original signatories by the treaty. The members of the Wahkiakum, a tribe of fish-eating Indians of the locality, have the opportunity to take an allotment on the Quinault Reservation and to exercise the fishing rights which accompany that allotment. Those fishing rights are secured by Article III [of the Treaty of Olympia] which protects the rights of the Quinault and *any affiliated tribe* to fish at all usual and accustomed Quinault fishing grounds.

*Id.* at 179–80 (emphasis added).

This passage appears to support the Tribes' claim that affiliated *tribes* have a right to fish at Quinault grounds. But when specifying this right, the passage refers only to individual *members* of such tribes who obtain allotments on the Quinault Reservation. For this reason and because the passage is dictum, it does not compel a conclusion that the Tribes are entitled to Quinault fishing rights.

We conclude that the Tribes are not entitled to Quinault fishing rights. They have not merged or consolidated with the Quinault "in a manner sufficient to combine their tribal or political structures," as required by *Suquamish Indian Tribe*, 901 F.2d at 775–76. Although they may have "affiliated" with the Quinault, "affiliation" is a term derived from the 1911 Allotment Act, which dealt with *individual* Indians. We do not equate it with "consolidation" as a means of conferring *tribal* rights.

The district court did not err in rejecting the Tribes' claim to Quinault fishing rights.

## B. Aboriginal Fishing Rights

■ The Tribes argue that the district court erred in finding that the Chehalis Tribe does not have a right, based on aboriginal title, to fish at Chehalis usual and accustomed fishing grounds. We review for clear error the factual question whether a tribe still retains such rights. *See Wahkiakum*, 655 F.2d at 180 n. 12 ("Whether or not an aboriginal right exists would be a question of fact to establish continuous exercise of the right since before pre-treaty times.").

■ Aboriginal title refers to the right of the original inhabitants of the United States to use and occupy their aboriginal territory. *Tee–Hit–Ton Indians v. United States*, 348 U.S. 272, 279, 75 S.Ct. 313, 317, 99 L.Ed. 314 (1955). It exists at the pleasure of the United States, and may be extinguished "by treaty, by the sword, by purchase, by the exercise of complete dominion adverse to the right of occupancy, or otherwise...." *United States v. Santa Fe Pacific R.R. Co.*, 314 U.S. 339, 347, 62 S.Ct. 248, 252, 86 L.Ed. 260 (1941). Extinguishment terminates corresponding use and occupancy rights, including fishing rights, except where such rights are expressly or impliedly reserved in a treaty, statute or executive order. *See Western Shoshone Nat'l Council v. Molini*, 951 F.2d 200, 202–03 (9th Cir.1991) (tribe's aboriginal hunting and fishing rights taken when full title extinguishment occurred absent express reservation of those rights), *cert. denied*, 506 U.S. 822, 113 S.Ct. 74, 121 L.Ed.2d 39 (1992); *see also Wahkiakum*, 655 F.2d at 180 n. 12 ("An aboriginal right to fish has been recognized only in the context of interpretation of a ratified treaty or federal statute, where courts have held that aboriginal fishing rights were impliedly reserved to the Indians.").

■ The district court found that an 1863 executive order opening lands in Southwest Washington for settlement by non-Indians was inconsistent with exclusive use and occupancy of any of the local tribes and therefore extinguished any remaining aboriginal title in the region. The court also found that all aboriginal fishing rights of Indians to which

the Tribes claim successorship were extinguished with aboriginal title.

The Tribes do not directly confront these factual findings. Instead, they argue that a settlement provision contained in a 1963 Indian Claims Commission award "expressly reserved [Chehalis] aboriginal hunting and fishing rights." *See Upper Chehalis Tribe v. United States,* 12 Ind. Cl. Comm. 644, 648 (1963). This argument is without merit. The provision stated only that the settlement, which resolved that all Chehalis aboriginal tribal lands had been taken, "in no way or manner releases ... any hunting and fishing rights of the Chehalis Indians...." *Id.* The provision did not reserve aboriginal fishing rights, but said only that the settlement had no effect on existing fishing rights, if any. But as the district court found, there were no such rights because they had been extinguished with aboriginal title. We reject the Tribes' claim to Chehalis aboriginal fishing rights.

### C. Fishing Rights Arising from Orders Creating the Reservations

▇ The Tribes argue that the district court erred in concluding that the orders creating the Shoalwater and Chehalis Reservations did not impliedly reserve off-reservation fishing rights. Although we review de novo the court's interpretation of executive orders, we review questions of historical fact for clear error. *United States v. Lummi Indian Tribe,* 841 F.2d 317, 319 (9th Cir. 1988).

▇ The court based its conclusion partly on the legal ground that off-reservation fishing rights must be expressly reserved. It relied on *Mescalero Apache Tribe v. Jones,* 411 U.S. 145, 93 S.Ct. 1267, 36 L.Ed.2d 114 (1973), which says that, "[a]bsent express federal law to the contrary, Indians going beyond reservation boundaries have generally been held subject to nondiscriminatory state law otherwise applicable to

all citizens of the State." *Id.* at 148–49, 93 S.Ct. at 1270. The question here, however, is whether the executive orders, issued before Washington became a state, contained implied off-reservation fishing rights.[2] In considering this question, we must keep in mind that the specific purposes of executive-order reservations were often unarticulated. *Colville Confederated Tribes v. Walton,* 647 F.2d 42, 47 (9th Cir.), *cert. denied,* 454 U.S. 1092, 102 S.Ct. 657, 70 L.Ed.2d 630 (1981). To identify these purposes, and the rights associated with them, we must consider the executive orders themselves, the circumstances surrounding their creation, and the history of the Indians for whom they were created. *Id.* As with treaties, executive orders are interpreted as the Indians would have understood them, and any doubtful expressions in them should be resolved in the Indians' favor. *Parravano,* 70 F.3d at 544.

▇ Although the district court may have based its rejection of the Tribes' rights on an incomplete review of the law applicable to executive order reservations, it also based its rejection on separate and independent findings of historical fact. These findings show that the court conducted the inquiry required in *Colville Confederated Tribes.* With respect to the Chehalis Reservation, the court found that "there was no United States intent to create or reserve any off-reservation fishing right by implication." It found also that:

> The Executive Order reserving lands for the Chehalis Indians was not conditional or based upon agreement with the Indians. The Upper Chehalis Indians at that location did not believe or understand that they were obtaining a treaty or treaty rights, nor did they believe they were obtaining any off-reservation fishing right from the United States.

The record supports these findings. A letter from Commissioner of Indian Affairs Dole, proposing the Chehalis Reservation,

---

**2.** Because the reservations were created before Washington became a state, the general rule of *Mescalero* has little bearing on the question whether implied rights arise from the executive orders creating these reservations. *See Moore v. United States,* 157 F.2d 760, 764 (9th Cir.1946)

(implied rights arising from executive order creating the Quileute Reservation take precedence over express rights granted to subsequently created state), *cert. denied,* 330 U.S. 827, 67 S.Ct. 867, 91 L.Ed. 1277 (1947).

described the Indians' desire to "abandon their roving life" and "cultivate their lands." I Charles Kappler, *Laws and Treaties*, 901–02 (1904). The letter intimated that the purpose of the reservation was to provide farmlands for the Indians, and made no mention of fishing rights at traditional grounds off the reservation.

Similarly, Sidney Ford, Indian Agent for the Chehalis and Coast District, reported in 1856 that the Upper and Lower Chehalis Indians "seem desirous of living more like the whites, of cultivating lands and raising stock." He added that:

> A locality can be selected where there is an abundance of good farming lands, plenty of timber, and natural meadows more than sufficient to supply all their Stock for years to come. The Chehalis River traverses their country from East to West affording not only fine fishing grounds, but also with its numerous springs and branches, an ample supply of water for all farming purposes. . . .

Letter from Ford to Simmons, October 10, 1856. This letter suggests that the primary intent for creating the Chehalis Reservation was to provide farming lands for the Indians. It also suggests that the Indians could fulfill their fishing needs at the fishing grounds contained in the reservation.

We conclude that the court did not err in rejecting the claim that the executive order creating the Chehalis Reservation contained an implied off-reservation fishing right.

■ As for the Shoalwater Reservation, the court found that:

> There was no executive intent or United States intent to create or reserve off-reservation fishing rights for any group of Indians or for the eventual occupants of the lands reserved on Shoalwater Bay. That the lands were proximate to fishing and other resources was a factor in selecting the location, but this does not amount to the creation of a special off-reservation fishing right.

It also found that:

> There is no evidence or indication that any Indians understood the 1866 Executive Order to be creating or reserving off-reserva-

tion rights associated with the Shoalwater Bay Reservation.

The record does reveal some evidence suggesting an intent on the part of the government to provide off-reservation fishing for the Shoalwater Indians. For example, the failed Dart treaties contemplated fishing rights for the Shoalwater Bay Indians at the rivers emptying into the Bay. And in 1854, Indian Agent W.H. Tappan wrote to Governor Stevens that "[the Indians] at Shoalwater Bay should have free access to the clam and oyster banks and to the fisheries of the Chehalis and Columbia rivers." Letter from Tappan to Stevens, Sept. 30, 1854. After treaty negotiations at the Chehalis River Council failed, Governor Stevens instructed Indian Agent Simmons to negotiate treaties with the remaining non-treaty Indians in Southwest Washington, saying, "[t]he Chinooks, Shoalwater Bay and Lower Chehalis may be informed that their reservation will be selected so as to provide them with fishery and potatoe grounds." Letter from Stevens to Simmons, May 3, 1855.

We are not, however, "left with the definite and firm conviction" that the district court made a mistake in its findings. *Sawyer v. Whitley*, 505 U.S. 333, 346, n. 14, 112 S.Ct. 2514, 2522, n. 14, 120 L.Ed.2d 269 (1992). Under the highly deferential clear error standard, we conclude that the court did not err in rejecting the Shoalwater Tribe's claim to implied off-reservation fishing rights.

## D. Boundaries of the Chehalis Reservation

■ The state cross-appeals the district court's judgment that the Chehalis Reservation retains the boundaries set by the 1864 order creating the reservation, and that executive orders of 1886, 1908 and 1909 did not diminish the size of the reservation. We review de novo the court's interpretation of these executive orders. *See United States v. State of Washington*, 969 F.2d at 754–55.

■ Once a reservation is established, there is a strong presumption that it remains intact. *See DeCoteau v. District County Court*, 420 U.S. 425, 444, 95 S.Ct. 1082, 1092–93, 43 L.Ed.2d 300 (1975). We do not lightly

infer diminishment of reservations, and resolve any ambiguities concerning alleged diminishment in favor of the Indians. *Hagen v. Utah,* 510 U.S. 399, 410–11, 114 S.Ct. 958, 965, 127 L.Ed.2d 252 (1994). We conclude that a reservation is diminished only if there is "substantial and compelling evidence" of an intent on the part of the government to diminish. *Solem v. Bartlett,* 465 U.S. 463, 472, 104 S.Ct. 1161, 1167, 79 L.Ed.2d 443 (1984).

■ The most probative evidence of diminishment is the statutory language used to open the Indian lands. *Id.* at 470, 104 S.Ct. at 1166. Courts also consider the circumstances leading up to the passage of the law, and to a lesser extent, the events occurring after its passage. *Id.* at 471, 104 S.Ct. at 1166–67. Information concerning persons who actually moved onto the opened reservation lands and the subsequent demographic history of the opened lands is also relevant. *Id.* at 471–72, 104 S.Ct. at 1166–67.

■ The 1886 executive order opening up the Chehalis Reservation said: "It is hereby ordered that the following tract of country in Washington Territory, reserved for the use and occupation of the Chehalis Indians, by order of the Secretary of the Interior, dated July 8, 1864, be, and the same is hereby, restored to the public domain:...." I Charles Kappler, *Indian Affairs: Laws and Treaties* 903 (1904). The order also provided that approximately 471 acres "be, and the same is hereby, withdrawn from sale or other disposition, and set apart for the use and occupation of the Chehalis Indians." *Id.* at 904.

On its face, the order appears to diminish the size of the reservation. Cf. *Hagen,* 510 U.S. at 411–13, 114 S.Ct. at 966 (holding that congressional act restoring reservation land to the public domain evidenced a congressional intent to diminish); *Seymour v. Superintendent of Washington State Penitentiary,* 368 U.S. 351, 354, 82 S.Ct. 424, 426, 7 L.Ed.2d 346 (1962) (holding that size of Colville Indian Reservation was diminished by a congressional act stating that about one-half of the original reservation should be "vacated and restored to the public domain.").

The historical circumstances surrounding the order, however, show that there was no executive intent to diminish the reservation. In the years between the establishment of the Chehalis Reservation and the 1886 executive order, the government was in the process of allotting reservations. *See* F. Cohen, *Handbook of Federal Indian Law* 129–30 (1982 ed.). The Stevens Treaties routinely contained provisions authorizing the eventual allotment of reservations. *See, e.g., Wahkiakum,* 655 F.2d at 179 n. 6 (quoting Article VI of Treaty of Olympia, which expressly granted President authority to allot Quinault Reservation). The secretarial order creating the Chehalis reservation, however, contained no authorization for allotment. This was a cause of frustration and concern for the local Indian officials. In 1878, Agent Milroy wrote to the Commission of Indian Affairs of the injustice of denying allotments to the Chehalis and Shoalwater Bay Indians. Referring to the Shoalwater, he said:

> It surely is not the policy or interest of the Government to continue these Indians in enforced communism, and deny them individual titles to homes on a reservation set appart [sic] to them by their Great Father the President out of a country that was once *legally* and *equitably* theirs and the title to which they have never parted with.

Letter from Milroy to Commissioner of Indian Affairs, Oct. 25, 1878 (emphasis in original).

Milroy urged the Commissioner "to try to discover some way by which legal titles may be granted to such Indians of said two non treaty Reservations, as have substantially complied with the requirements of our homestead laws...." *Id.* He added: "If there is a *will,* then surely can be found a *way* to do justice to these poor Indians." *Id.* (emphasis in original).

For years, however, no action was taken to secure individual property titles for the Chehalis Indians. In 1885, Indian Agent Edwin Eells finally proposed a solution to the problem: "I have suggested to the [Department of the Interior] that the executive order be so changed that the Indians residing thereon be allowed to take the lands they occupy under the Indian homestead laws. If this could be

done they would then be secured in the quiet and peaceable possession of their homes." *Annual Report of the Commissioner of Indian Affairs to the Secretary of the Interior for the Year 1885*, 193 (1885).

In 1886, the Commissioner of Indian Affairs recommended to the Secretary of the Interior that the government adopt Eells' proposal that the Chehalis lands "be restored to the public domain, and be then entered by the Indian occupants under the homestead laws." Letter from Commissioner Atkins to Secretary of the Interior, Sept. 25, 1886. The Commissioner explained:

> As soon as the lands are restored, the Indians can make their entries, and under the Land Office circular of May 31, 1884, *no other persons can enter the lands occupied by them.* The titles acquired under the homestead laws as amended by the act of July 4, 1884, (23 Stats.96) are inalienable for a period of twenty-five years.

*Id.* (emphasis added). He noted that the Indians were "anxious to receive titles for their lands, more especially as all the other Indians belonging to the Nisqually Agency" had received such title. *Id.* "This desire has existed for some years, and is a natural one which ought to be granted if possible." *Id.*

The Commissioner included a draft of an executive order restoring the lands to the public domain and setting apart 471 acres for an Indian school. *Id.* President Cleveland signed the order in 1886.

These documents reveal no "substantial and compelling evidence" of an intent on the part of the government to diminish the reservation. *Solem*, 465 U.S. at 472, 104 S.Ct. at 1167. Instead, they show an intent to provide the Chehalis with the same allotments that the treaty reservation Indians enjoyed. The restoration of lands to the public domain was merely an expedient means of granting them allotments in the form of homesteads.

Similarly, our review of the subsequent treatment of the land does not provide "substantial and compelling evidence" of an intent to diminish. There is some evidence suggesting diminishment. For example, a 1964 letter from an Indian Agency Realty officer to the Superintendent of Indian Affairs said that "[t]he present Chehalis Reservation area consists of 346.7 acres, more or less." Letter from John Vaninetti to Superintendent of Indian Affairs Felshaw, March 16, 1964.

But other evidence suggests no diminishment. For example, a 1906 school superintendent's report described the reservation as maintaining its original boundaries:

> [It] is located near Oakville, Chehalis County, and these Indians are gradually improving their allotments and are generally prosperous. The low land is quite fertile and the higher land is used for winter grazing. The day school is well attended and has been quite successful. New roads have been built and old ones repaired, and we now have an excellent road thru the reservation to Oakville.

Reports Concerning Indians in Washington, p. 376 (1906).

Also, a 1952 agreement between the Chehalis Tribe and the Washington Department of Fisheries concerning regulation of fishing on the reservation recognized the existence of an on-reservation fishery within the original reservation boundaries. Agreement between the Chehalis Indian Tribal Council and the Wash. Dept. of Fisheries, Oct. 9, 1952.

As for the persons who actually moved onto the reservation, the executive order and related documents indicate that only the reservation Indians could take homesteads on the opened lands, and were to do so once the lands were restored to the public domain. *See* Letter from Commissioner Atkins to Secretary of the Interior, Sept. 25, 1886. Thus, initially the lands were occupied by reservation members only. They were not immediately open to white settlers.[3]

---

3. The Indians were, however, allowed to sell their homesteads after 25 years, just as Indians on treaty reservations could sell their allotments after 25 years. *See* General Allotment Act § 5, 24 Stat. 388, 389 (1887). A 1989 report by the Confederated Tribes of the Chehalis Reservation says that by 1967, 2,484.25 of the original 4,214.83 reservation acres had been transferred to non-Indians. The remaining 1,730.58 acres were tribal lands or trust lands held by descendants of the original allottees of the reservation.

We conclude that the 1886 executive order did not diminish the size of the Chehalis reservation.[4] The Court's recent decision in *Hagen* does not require a contrary result. There, the Court found diminishment where a congressional act restored reservation land to the public domain. 510 U.S. at 411–15, 114 S.Ct. at 966–67. The act, however, applied to surplus lands remaining after allotment of the reservation. *Id.* at 413–15, 114 S.Ct. at 967. Also, it restored these lands to the public domain for sale or settlement by *non-Indians*. *Id.* at 402–04, 406–10, 114 S.Ct. at 961, 963–64. Here, as noted, the executive order restored lands solely to provide allotments to the members of the reservation. It applied only to Indians and involved no surplus land.

### *CONCLUSION*

We affirm the district court's judgment rejecting the Tribes' claims to Quinault fishing rights and the claim to fishing rights based on Chehalis aboriginal title. We also affirm the judgment denying the Tribes' claims to off-reservation fishing rights based on the orders creating their reservations. We affirm the court's judgment that the Chehalis Reservation was not diminished by subsequent executive orders.

AFFIRMED.

Confederated Tribes of the Chehalis Reservation, *The Chehalis People* (1989).

**4.** We reach the same conclusion with respect to the 1908 and 1909 orders, which, following the form of the 1886 order, were meant to provide two homesteads from the 471–acre parcel reserved for the school.