**NOTICE:   SLIP OPINION**
**(not the court's final written decision)**

The opinion that begins on the next page is a slip opinion.  Slip opinions are the written opinions that are originally filed by the court.

A slip opinion is not necessarily the court's final written decision.  Slip opinions can be changed by subsequent court orders.  For example, a court may issue an order making substantive changes to a slip opinion or publishing for precedential purposes a previously "unpublished" opinion.  Additionally, nonsubstantive edits (for style, grammar, citation, format, punctuation, etc.) are made before the opinions that have precedential value are published in the official reports of court decisions: the Washington Reports 2d and the Washington Appellate Reports.  An opinion in the official reports replaces the slip opinion as the official opinion of the court.

**The slip opinion that begins on the next page is for a published opinion, and it has since been revised for publication in the printed official reports.**  The official text of the court's opinion is found in the advance sheets and the bound volumes of the official reports.  Also, an electronic version (intended to mirror the language found in the official reports) of the revised opinion can be found, free of charge, at this website: https://www.lexisnexis.com/clients/wareports.

For more information about precedential (published) opinions, nonprecedential (unpublished) opinions, slip opinions, and the official reports, see https://www.courts.wa.gov/opinions and the information that is linked there.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

**IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON**

**DIVISION II**

| | |
|---|---|
| ANDREW LARRY SIMMONS, | No. 55019-9-II |
| Petitioner, | |
| v. | |
| STATE OF WASHINGTON, | |
| Respondent. | |
| MICHAEL MYRON SIMMONS, | No. 55029-6-II |
| Petitioner, | |
| v. | PUBLISHED OPINION |
| STATE OF WASHINGTON, | |
| Respondent. | |

PRICE — Andrew and Michael Simmons appeal from their convictions of first and second degree unlawful recreational fishing. As members of the Cowlitz Indian Tribe, they argue they have off-reservation aboriginal rights to fish that have not been extinguished. We disagree with their arguments and affirm their convictions.

No. 55019-9-II
(consolidated with No. 55029-6-II)

FACTS

I. HISTORICAL BACKGROUND[1]

The Chinook Nation, Confederated Tribes of the Chehalis Reservation, and Cowlitz Indian Tribe lived in Southwest Washington for centuries before the arrival of predominantly white encroaching settlers. They were considered Native Americans whose livelihood depended on fish and seafood. The Cowlitz Tribe fished all along the southern Washington coastline at times extending up into British Columbia.[2]

In 1855, Governor Stevens of Washington Territory held a treaty council at the Chehalis River. Members of local tribes, including Chehalis, Chinook, and Cowlitz Tribes, attended. Governor Stevens proposed a treaty whereby all tribes of the region would be removed to a reservation in the Quinault Indian Nation's territory. Article III of the proposed treaty guaranteed signing tribes "the right of taking fish at all usual and accustomed grounds and stations." *Confederated Tribes of Chehalis Indian Rsrv. v. Washington*, 96 F.3d 334, 338 (9th Cir. 1996). Article VI allowed the President of the United States to consolidate the signing tribes with other "friendly tribes and bands." *Id.*

Several of the tribes, including the Cowlitz Tribe, refused to sign a treaty because they were dissatisfied with the proposed terms, including the location of their reservations. "Governor Stevens intended to renew treaty negotiations with the non-signing tribes, but his attention was

---

[1] Unless otherwise noted, the information in this section is from *Confederated Tribes of Chehalis Indian Reservation v. Washington*, 96 F.3d 334 (9th Cir. 1996).

[2] Clerk's Papers at 129-31. The record is unclear as to the extent to which the Cowlitz Tribe fished these areas to the exclusion of other Native American tribes.

2

No. 55019-9-II
(consolidated with No. 55029-6-II)

diverted by other events, including the Civil War and the outbreak of an Indian War."

*Confederated Tribes*, 96 F.3d at 338.[3]  No treaty was ever reached with the Cowlitz Tribe.

Initially, Congress intended that aboriginal title in land west of the Cascades would be extinguished by treaty.  *Plamondon v. United States*, 25 Ind. Cl. Comm'n 442, 450 (1971).[4]  However, that intent shifted over time.  In 1853, Congress declared that in 1855, all lands west of the Cascades would be subject to public sale.  *Id.*

> It is clear that Congress anticipated that Indian title would be extinguished by 1855, because offering lands for public sale is totally inconsistent with the continued existence of Indian title in that land.  Treaties were entered into with most of the tribes west of the Cascades in 1854 and 1855.

*Id.*  But the Cowlitz Tribe remained without a treaty.

In 1860, the U.S. attempted to establish a reservation for the Cowlitz Tribe at the fork of the Blackwater and Chehalis Rivers, but the Cowlitz Tribe refused to move onto it.  *Id.* at 450-51.  In 1861, Congress appropriated money to remove the non-treaty tribes located in the Oregon and Washington Territories, among those the Cowlitz Tribe.  *Id.*

Consistent with this congressional intent to offer these lands for sale, in 1863, President Lincoln, through a proclamation (1863 Lincoln Proclamation), opened for public sale land in the Washington Territory, including the Cowlitz Tribe's land.  *Confederated Tribes of Grand Ronde Cmty. of Oregon v. Jewell*, 75 F. Supp. 3d 387, 394 (D.C. 2014); *Plamondon*, 25 Ind. Cl. Comm'n at 450-51.  Following this displacement, the Quinault Reservation was expanded in 1873 through

---

[3] We use the term "Indian" where it is part of statutory language or case law, but otherwise use the term "Native American."

[4] https://cdm17279.contentdm.oclc.org/digital/collection/p17279coll10/id/1976/rec/1.

3

No. 55019-9-II
(consolidated with No. 55029-6-II)

an executive order with the intent of settling additional non-treaty tribes, including the Cowlitz Tribe, on the reservation. The Cowlitz Tribe subsequently received the opportunity for an allotment on the Quinault Reservation. But the Cowlitz Tribe apparently never agreed to be resettled as a group on the Quinault Reservation.[5]

## II. CHARGES AND TRIAL

Andrew and Michael Simmons (Petitioners), members of the Cowlitz Tribe, were harvesting clams along the Washington coast without a license in an area where the Cowlitz Tribe historically had gathered clams. An officer from the Department of Fish and Wildlife approached Petitioners and found them to be in possession of 89 razor clams, in excess of the daily individual limit of 15. Petitioners admitted that they did not have a license to gather clams but claimed that, as members of the Cowlitz Tribe who lived on the Quinault Reservation, they were allowed to exercise the Quinault Tribe's treaty rights to gather clams. Petitioners were cited for unlicensed harvesting and for harvesting in excess of the daily limit.

The State charged Petitioners with first and second degree unlawful recreational fishing. Although Petitioners admitted that they were harvesting clams without a license, they moved to dismiss the charges, arguing that, as members of the non-treaty Cowlitz Tribe, they had unextinguished off-reservation aboriginal rights to fish that the State could not regulate. The county district court rejected the argument that Petitioners still retained aboriginal rights to fish, ruling that the United States Court of Appeals for the Ninth Circuit's decision in *Confederated*

---

[5] Historically never having its own reservation, the Cowlitz Tribe began the process in 2002 of applying to the federal government for an "initial reservation" under federal law in Clark County. *Jewell*, 75 F. Supp. 3d at 394.

4

No. 55019-9-II
(consolidated with No. 55029-6-II)

*Tribes* was controlling on the issue.  Following a stipulated facts bench trial, the district court

convicted Petitioners of both crimes.

Petitioners appealed, and the superior court affirmed their convictions.  Like the lower

court, the superior court determined that, consistent with *Confederated Tribes*, Petitioners had no

tribal rights to harvest shellfish because the 1863 Lincoln Proclamation effectively extinguished

the aboriginal rights of the Cowlitz Tribe, including any aboriginal rights to fish.

Petitioners appeal.

ANALYSIS

I. Aboriginal Off-Reservation Fishing Rights

Petitioners argue that, as members of the Cowlitz Tribe, they have off-reservation

aboriginal rights to fish and these rights continue to exist absent express action by Congress

extinguishing them.  The State maintains that these aboriginal rights were extinguished by the

1863 Lincoln Proclamation and related congressional authorizations that put unoccupied lands up

for sale.[6]  We agree with the State and hold that the Cowlitz Tribe's off-reservation aboriginal

rights to fish have been extinguished.

A. Legal Principles

" 'Absent express federal law to the contrary, Indians going beyond the reservation

boundaries have generally been held subject to nondiscriminatory state law otherwise applicable

to all citizens of the State.' "  *United States v. Washington*, 520 F.2d 676, 684 (9th Cir. 1975)

---

[6] Petitioners argue that their aboriginal rights, as originally possessed, have not been effectively extinguished.  Petitioners do not contend they possess treaty rights, and they do not argue that their aboriginal rights have been reserved by an overt act of the federal government.  Accordingly, this opinion is limited in scope to addressing Petitioners' specific aboriginal rights argument.

5

No. 55019-9-II
(consolidated with No. 55029-6-II)

(quoting *Mescalero Apache Tribe v. Jones*, 411 U.S. 145, 148-49, 93 S. Ct. 1267, 36 L. Ed. 114

(1973)).

> Native Americans may also possess aboriginal title:
>
> Aboriginal title, or original Indian title, refers to American Indian land occupancy
> rights premised on exclusive use and occupancy of a particular territory at the time
> of first European contact, and to an entitlement arising subsequent to such contact
> under the governing European's sovereign's laws, which are derived largely from
> international law concepts that prevailed before the American Revolution.

*Pueblo of Jemez v. United States*, 350 F. Supp. 3d 1052, 1093 (N.M. 2018). These rights include

the right to fish in places where a tribe has historically done so.[7] *Confederated Tribes*, 96 F.3d at

341. "Aboriginal title refers to the right of the original inhabitants of the United States to use and

occupy their aboriginal territory." *Id.*

Aboriginal title is extinguishable through multiple means. *See id.* The federal government,

as sovereign, has inherent power to take the land of Native Americans and extinguish their

aboriginal rights. *Id.* As Justice Marshall stated, "the exclusive right of the United States to

extinguish [Native American] title, and to grant the soil, has never . . . been doubted." *Johnson v.*

*M'Intosh*, 21 U.S. 543, 586, 5 L. Ed. 681 (1823). Aboriginal title exists at the federal government's

pleasure and "may be extinguished 'by treaty, by the sword, by purchase, by the exercise of

complete dominion adverse to the right of occupancy, or otherwise . . . .' " *Confederated Tribes*,

96 F.3d at 341 (quoting *United States v. Santa Fe Pacific R.R. Co.*, 314 U.S. 339, 347, 62 S. Ct.

248, 86 L. Ed. 260 (1941)).

---

[7] Aboriginal rights also generally require exclusivity of use by the tribe asserting the rights. *See Pueblo*, 350 F. Supp. 3d at 1097-1101. Because neither party discusses whether the Cowlitz Tribe's historical fishing patterns satisfy this requirement for the area in which Petitioners were cited for unlawful fishing, we do not further address it.

No. 55019-9-II
(consolidated with No. 55029-6-II)

Although aboriginal title is extinguishable in several ways, Congress still has the exclusive power to extinguish aboriginal title, and its intent to do so must be " 'plain and unambiguous . . . .' " *Pueblo*, 350 F. Supp. 3d at 1093 (quoting *Santa Fe*, 314 U.S. at 346). "Congress' intent to extinguish aboriginal title must express on the face of the legislative act or treaty authorizing extinguishment, or be clear from the surrounding circumstances." *Id.* at 1104.

Even though extinguishment must be tied to congressional action, "several federal courts have held that [c]ongressional acts in anticipation of settlement and public use, and actual settlement, by non-Indians are factors that may affect extinguishment." *Id.* at 1093; *see also Gila River Pima-Maricopa Indian Cmty. v. United States*, 494 F.2d 1386, 1393-95 (Ct. Cl. 1974) (executive order enlarging reservation followed by congressional appropriation of funds for maintenance of enlarged reservation was sufficient to establish extinguishment); *United States v. Gemmill*, 535 F.2d 1145, 1148-49 (9th Cir. 1976) (a congressional statute requiring individuals claiming lands to present their claims or lose their rights combined with the military defeat of the Native Americans, the designation of land in question as a forest reserve, and the related compensation awards to the Native Americans were sufficient to establish extinguishment); *State v. Coffee*, 97 Id. 905, 910-11, 556 P.2d 1185 (1976) (aboriginal title of the Kootenai Tribe of Idaho was extinguished by Senate ratification of treaty ceding Kootenai lands and requiring Kootenai to move to reservation even though Kootenai were not parties to the treaty).

We construe treaties, statutes, and executive orders liberally in favor of establishing Native American rights. *Confederated Tribes*, 96 F.3d at 340. Any ambiguity should be resolved in favor of Native Americans. *Id.* "These rules of construction 'are rooted in the unique trust relationship

7

No. 55019-9-II
(consolidated with No. 55029-6-II)

between the United States and the Indians.' " *Id.* (quoting *Oneida County v. Oneida Indian Nation*, 470 U.S. 226, 247, 105 S. Ct. 1245, 84 L. Ed. 2d 169 (1985)).

We review an interpretation of presidential proclamations and executive orders de novo. *Id.*

Historical questions of fact, including whether a tribe's aboriginal rights to fish have been extinguished, are reviewed for clear error. *Id.* at 341; *see also State v. Posenjak*, 127 Wn. App. 41, 48, 111 P.3d 1206 (2005). "A clear error is 'when the evidence in the record supports the finding but the reviewing court is left with a definite and firm conviction that a mistake has been committed.' " *North Kitsap Sch. Dist. v. K.W.*, 130 Wn. App. 347, 360, 123 P.3d 469 (2005) (internal quotation marks omitted) (quoting *Amanda J. v. Clark County Sch. Dist.*, 267 F.3d 877, 887 (9th Cir. 2001)).

B. *PLAMONDON* AND *CONFEDERATED TRIBES*

The question of whether tribal aboriginal rights previously existing in Washington's coastal areas have been extinguished has been addressed in two cases, by the federal Indian Claims Commission (Court of Claims) in *Plamondon* and by the Ninth Circuit in *Confederated Tribes*.

In *Plamondon*, the Court of Claims considered the question of the extinguishment of the aboriginal title specific to the Cowlitz Tribe. *Plamondon, ex rel. Cowlitz Tribe of Indians v. United States*, 467 F.2d 935, 937-38 (Ct. Cl. 1972). The Court of Claims determined that the initial limited settlement by non-Native Americans in the 1850s alone was insufficient to extinguish aboriginal title because the settlement was limited and did not disrupt the Cowlitz Tribe's way of life. *Id.* However, the Court of Claims determined that by 1863, there was substantial settlement of the Cowlitz Tribe's land such that "the non-Indians greatly outnumbered the Indians, the Indians

8

No. 55019-9-II
(consolidated with No. 55029-6-II)

intermingled with the non-Indians and no longer maintained an independent existence, and they were thus deprived of the exclusive use and occupancy of their aboriginal lands." *Pueblo*, 350 F. Supp. 3d at 1107 (citing *Plamondon*, 467 F.2d at 936-37). These facts, combined with Congress' attempt to establish a reservation for the Cowlitz Tribe and the evidence that Congress intended to foreclose treaty negotiations and sell the Cowlitz Tribe's land, provided sufficient support for the court to find that the aboriginal title of the Cowlitz Tribe had been extinguished by 1863. *Plamondon*, 467 F.2d at 937.

In *Confederated Tribes*, the Shoalwater Bay Indian Tribe and the Chehalis Tribe asserted they possessed off-reservation fishing rights using several arguments, including that they possessed aboriginal fishing rights that had not been extinguished. 96 F.3d at 337.

Among its holdings, *Confederated Tribes* rejected the tribes' arguments and determined that any non-treaty aboriginal rights had been extinguished. *Id.* at 342. Recognizing the relative ease with which aboriginal rights can be terminated, the Ninth Circuit affirmed the U.S. District Court's decision that the 1863 Lincoln Proclamation that opened the lands of Southwest Washington, including those of the Cowlitz Tribe, for settlement extinguished any remaining aboriginal title, including any remaining fishing rights. *Id*. at 341-42. The court stated:

> The district court found that an 1863 executive order opening lands in Southwest Washington for settlement by non-Indians was inconsistent with exclusive use and occupancy of any of the local tribes and therefore extinguished any remaining aboriginal title in the region. The court also found that all aboriginal fishing rights of Indians to which the Tribes claim successorship were extinguished with aboriginal title.
>
> . . . . We reject the Tribes' claim to Chehalis aboriginal fishing rights.

*Id.*

9

No. 55019-9-II
(consolidated with No. 55029-6-II)

C.  APPLICATION

Both parties agree that there was no treaty between the Cowlitz Tribe and the federal government.  Petitioners concede that the Cowlitz Tribe does not have treaty rights to fish off the Cowlitz Tribe's reservation, but they argue that the Cowlitz Tribe's aboriginal rights to do so have not been extinguished.  Specifically, Petitioners maintain that the 1863 Lincoln Proclamation did not effectively extinguish the Cowlitz Tribe's right to fish because, under the Indian Commerce Clause[8] and U.S. treaty power, these rights can be extinguished only by an express act of Congress, and there has been no such act.  They argue that because the 1863 Lincoln Proclamation was not ratified or authorized by Congress, the Cowlitz Tribe continues to possess an aboriginal right to fish.  We disagree and determine that the off-reservation rights of the Cowlitz Tribe to fish have been extinguished.

Although an act of Congress is required to extinguish aboriginal title, this does not mean Congress is required to pass a law, execute a treaty, or otherwise explicitly state that it is extinguishing aboriginal title.  Congressional intent to extinguish aboriginal title can be inferred from its actions.  In 1853, Congress declared that in 1855 all lands west of the Cascades were to be subject to public sale.  And in 1861, Congress allocated money to remove the non-treaty Native Americans, including the Cowlitz Tribe, from their territory.  The Cowlitz Tribe subsequently had the opportunity to move onto the Quinault Reservation prior to their land being put up for sale.  And in 1863, the Cowlitz Tribe's land was ordered to be sold by the 1863 Lincoln Proclamation.  As the Court of Claims explained in *Plamondon*, congressional intent can be inferred from

---

[8] U.S. CONST. art. I, § 8, cl. 3.

10

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

No. 55019-9-II
(consolidated with No. 55029-6-II)

Congress' allocation of funds to remove the Cowlitz Tribe and its attempt to establish an allotment for the Cowlitz Tribe on the Quinault Reservation. The 1863 sale of the Cowlitz Tribe's land and the additional congressional actions surrounding that sale so substantially interfered with the previous and historical use of the area by the Cowlitz Tribe that it extinguished their aboriginal title to the land.

Petitioners also argue that, even if their aboriginal rights of *occupancy* have been extinguished, the Cowlitz Tribe's aboriginal *fishing rights* have not been extinguished. They assert that aboriginal fishing rights are separate and more expansive than aboriginal occupancy rights and survive the extinguishment of the aboriginal right to occupy a territory. Citing *Kimball v. Callahan*, 590 F.2d 768, 773 (9th Cir. 1979), Petitioners claim that tribal members hold fishing rights separate from the rights to occupy ancestral ground.

*Kimball*'s holding is not as broad as Petitioners urge and does not help them here. *Kimball* involved a statute terminating tribal occupancy that specifically stated that hunting and fishing rights were not abrogated. 590 F.2d at 772. Because there is no similar provision here that excepted fishing rights from the 1863 extinguishment of aboriginal title, there is no persuasive parallel to be drawn between *Kimball* and the present case. Moreover, not only is Petitioners' argument contrary to the holding in *Confederated Tribes* (which found aboriginal hunting and fishing rights extinguished along with occupancy rights), but Petitioners cite to no authority that would permit us to recognize, in the current context, their distinction between aboriginal occupancy rights and aboriginal fishing rights.

Finally, Petitioners maintain that the county district court and superior court both misread *Confederated Tribes* and that the case has minimal relevance to their appeal. They argue that

11

No. 55019-9-II
(consolidated with No. 55029-6-II)

*Confederated Tribes* did not analyze its legal questions under the normal canons of construction of Indian law that give preference to tribal interests. This argument is unpersuasive.

*Confederated Tribes* involved several alternative claims by the tribes. *See generally*, 96 F.3d 334. One of these involved a claim by the Chehalis Tribe that they possessed the treaty fishing rights of the Quinault because of their historical connection with the Quinault. *Id.* at 340. Because this claim involved the conflicting interests of two different tribes, the Chehalis and the Quinault, the court reasonably concluded it could not apply the typical canon of tribal preference to that specific claim—which tribe, for example, would receive the preference? *See id.* at 340-41.

However, this argument that created a conflict between the tribes was only one discrete legal issue in *Confederated Tribes*. As explained above, the case also addressed, as a completely separate issue, the aboriginal rights of the Confederated Tribes. There was no conflict between the plaintiff tribes and the Quinault with regard to the aboriginal rights issue, and on that issue, the court was silent as to any rejection of the canon of tribal preference. *Id.* at 341-42. Petitioners provide no convincing basis to reject the application of *Confederated Tribes* to this case.

Viewing the historical record, including our de novo review of the consequences of the 1863 Lincoln Proclamation and the related congressional action facilitating the sale of the Cowlitz Tribe's land, and consistent with the interpretation made by *Confederated Tribes* and *Plamondon*, the Cowlitz Tribe's off-reservation aboriginal rights to fish have been extinguished. Accordingly, we determine that the superior court did not err in making this same determination.

No. 55019-9-II
(consolidated with No. 55029-6-II)

## II. WASHINGTON CIVIL RIGHTS LAW

Separate from federal Indian law, Petitioners also argue that their aboriginal rights to fish are protected by Washington civil rights law, pointing to our Supreme Court's recent decision in *State v. Towessnute*, 197 Wn.2d 574, 486 P.3d 111 (2021). We disagree.

In *Towessnute*, our Supreme Court repudiated its prior decision, which rejected the off-reservation treaty rights to fish of Towessnute as a member of the Confederated Tribes and Bands of the Yakama Nation. *Id.* at 575-78. The court determined that the decision against the tribal member was an example of racial injustice as well as a result of a fundamental misunderstanding of the nature of treaties and the concept of tribal sovereignty. *Id.* at 577.

We agree that much of the historical mistreatment of indigenous peoples in this country has been a product of racial prejudice.[9] But nothing in the *Towessnute* decision permits us to change the outcome here. *Towessnute* involved a member of the Yakama Tribe charged with fishing crimes despite the fact that the Yakama Tribe had off-reservation rights to fish *by virtue of their treaty*. Here, there was no treaty, and as explained above, the off-reservation rights of the Cowlitz Tribe to fish have been extinguished. Accordingly, we determine this argument fails.

---

[9] "History, despite its wrenching pain cannot be unlived, but if faced with courage, need not be lived again." MAYA ANGELOU, ON THE PULSE OF MORNING (Random House 1993) https://billofrightsinstitute.org/activities/maya-angelou-on-the-pulse-of-morning-january-20-1993.

No. 55019-9-II
(consolidated with No. 55029-6-II)

CONCLUSION

Because the Petitioners' aboriginal rights to fish have been extinguish, we affirm their

convictions.

PRICE, J.

We concur:

LEE, P.J.

VELJACIC, P.

14